UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| SUNCOAST WATERKEEPER, OUR CHILDREN'S EARTH FOUNDATION, TAMPA BAY WATERKEEPER, and MANASOTA-88, | |
| Plaintiffs, | Civil Case No. 8:22-cv-00037 |
| v. | |
| CITY OF BRADENTON, FLORIDA, | |
| Defendant. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

Suncoast Waterkeeper ("SCWK"), Our Children's Earth Foundation ("OCE"), Tampa Bay Waterkeeper ("TBWK"), and ManaSota-88, (collectively, "Plaintiffs"), by and through their counsel, hereby allege as follows:

## I.     JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq. ("Clean Water Act" or "CWA") (see 33 U.S.C. § 1365). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. §§ 1331 and 2201 (an

1

action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On November 4, 2021, Plaintiffs issued a sixty (60) day notice letter ("Notice Letter") to the City of Bradenton ("Defendant" or the "City"). The Notice Letter informed the City of its violations of the Clean Water Act and of Plaintiffs' intention to file suit against the City. The Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IV, and the Secretary of the Florida Department of Environmental Protection ("FDEP") as required by Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

3.     More than sixty (60) days have passed since the Notice Letter was issued to the City and the state and federal agencies.

4.     Plaintiffs are informed and believe, and thereon allege, that neither EPA nor the state of Florida has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint under Section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty matter issued under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g). Accordingly, because the requirements of 33 U.S.C. § 1365(b)(1)(B) have been met, this matter may be commenced.

5.     The venue is proper in the Middle District of Florida, Tampa Division, pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district, specifically within Manatee County.

## II.     INTRODUCTION

6.     Plaintiffs allege the following violations of the Clean Water Act: (1) violations of the *State of Florida Domestic Wastewater Facility Permit* National Pollutant Discharge Elimination System ("NPDES") Permit No. FL0021369 ("NPDES Permit") (Causes of Action One, Two, and Eight); (2) discharges of pollutants to waters of the United States without an NPDES Permit authorization in violation of Section 301(a) of the Clean Water Act 33 U.S.C. §1311(a) (Cause of Action Three); (3) violations of the *State of Florida Municipal Separate Storm Sewer System ("MS4") Permit,* NPDES Permit No. FLS000037 ("MS4 Permit") (Cause of Action Four); and (4) violations of the NPDES and MS4 Permits' reporting requirements (Causes of Action Five, Six, and Seven). The City's violations of the Clean Water Act, its NPDES Permit and its MS4 Permits are ongoing and continuing.

### III.   PARTIES AND BACKGROUND

**A. Plaintiffs**

> **i.   Suncoast Waterkeeper**

7.     SCWK is a Florida non-profit public benefit corporation with members throughout Southwest Florida, including Manatee and Sarasota Counties and the broader Tampa Bay region.  SCWK is dedicated to protecting and restoring the Florida Suncoast's waterways through fieldwork, advocacy, environmental education, and enforcement, for the benefit of the communities and SCWK's members who rely upon these precious coastal resources. SCWK aims to protect local waterways for use for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation. To further its mission, SCWK actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. SCWK has been registered as a non-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time. SCWK is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 300 separate Waterkeeper programs, such as SCWK.

8.     SCWK represents its members in and around the City of Bradenton, the Manatee River, Tampa Bay and Sarasota Bay who have personally suffered

harm to their aesthetic, recreational, and employment-related interests due to the City's illegal discharges of wastewater effluent into the Manatee River, Wares Creek, Palma Sola Creek, and Palma Sola Bay which flow into Lower Tampa Bay, Sarasota Bay and the Gulf of Mexico (collectively, "Receiving Waters"), which are all Waters of the United States, in violation of the City's NPDES Permit limits and the City's sanitary sewer overflows ("SSOs") (*i.e.*, the unauthorized discharge of raw sewage, partially treated sewage, or treated reclaimed water) into the Receiving Waters. SCWK members enjoy some or all of these waters for boating, fishing, wading, body-contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

9.     SCWK members include residents in the vicinity of the Receiving Waters affected by the City's violations and who have reasonably founded fears that the pollutants contained in the City's SSOs, the excessive nutrient loading to the Receiving Waters in violation of the City's NPDES Permit effluent limits, and the City's exceedances of other NPDES Permit limitations have and will continue to contribute to poor water quality in the Receiving Waters that may be dangerous to them and human health and the environment. SCWK members also include: (1) residents of the communities that border the Manatee River, Tampa Bay and Sarasota Bay who have reasonably founded fears that the excessive nitrogen contained in the City's discharges of raw, partially treated and/or treated reclaimed water cause or exacerbate harmful algal blooms ("HABs") and the

decline in abundance and distribution of seagrasses, both of which negatively impact the Sarasota Bay and Tampa Bay estuaries; (2) commercial and/or charter fishermen who depend upon the ecological health the region's estuaries for their livelihood; (3) individuals who own and operate businesses in the tourism and marine service industries, whose businesses are adversely impacted by the City's illegal discharges and by public perception of poor water quality in the Receiving Waters; and (4) individuals who devote their time to cleanup, monitoring and/or restoration efforts in and around the Receiving Waters. SCWK members conduct nature surveys and studies, and photograph wildlife in and around some or all of the Receiving Waters. SCWK members contact some or all of the Receiving Waters directly when they perform maintenance work on boats, participate in body-contact water sports, or participate in organized cleanups and habitat restoration work along the shoreline.

10. SCWK members are interested in access to information which the City is required to report under the CWA. This information is made publicly accessible through the FDEP "Public Notice of Pollution" website and FDEP's Electronic Document Management System. This reportable information informs SCWK members, and the general public, about entities such as the City, who are discharging pollutants into the Receiving Waters used by members at levels that risk damage to the environment and human health, and the measures such entities are taking to prevent and mitigate pollution. SCWK members rely on this publicly available information for a variety of reasons including to determine

whether it is safe to use and enjoy some or all of the Receiving Waters, and to inform and develop advocacy plans or enforcement actions regarding the environmental, human health and safety impacts to some or all of the Receiving Waters caused by the sources of pollution. The City's consistent pattern of failed, delinquent, or inaccurate reporting to FDEP as required by its CWA permits has impaired and will continue to impair SCWK's right to public information and has hindered and will continue to hinder SCWK members' ability to use the reportable information for the above-mentioned purposes.

### ii.    Our Children's Earth Foundation

11.    OCE is a non-profit public benefit corporation with members throughout the United States, including the Tampa Bay and Sarasota Bay areas. OCE's mission is to promote public awareness of domestic and international human rights issues and environmental impacts through education, art, and private enforcement actions for the benefit of children and other populations who are the most vulnerable to pollution. OCE seeks to prevent environmental damage wherever possible and ensure that appropriate environmental protection statutes are being followed. Throughout its 20-year history, OCE has regularly initiated environmental enforcement actions on behalf of itself and its members. OCE has been registered as a non-profit corporation in Florida since 2016.

12.    Since 2016, OCE has focused on its environmental enforcement activities related to water quality in Florida. OCE members in the Tampa Bay and Sarasota Bay areas have repeatedly requested that OCE take legal action to

effectively address water pollution problems in their communities, as well as sources of pollution that exacerbate HABs. OCE members have expressed concern and fear regarding their exposure to raw and partially-treated sewage pollution, as well as the impacts of nutrient pollution to waters in Tampa Bay and Sarasota Bay, including to the Receiving Waters.

13.     OCE members have expressed frustration that local and state officials have failed to adequately address the City's polluting of the Receiving Waters, despite recurring HABs and raw and partially-treated sewage releases that impact members' businesses, recreational activities, and quality of life.

14.     OCE members have personally suffered harm to their aesthetic, recreational, and employment-related interests due to City's unauthorized discharges of raw or inadequately treated sewage and/or reclaimed water into the Receiving Waters. Members of OCE use some or all of those waters to regularly participate in boating, fishing, wading, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

15.     OCE members are interested in access to information which the City is required to report under the CWA. This information is made publicly accessible through the FDEP "Public Notice of Pollution" website and FDEP's Electronic Document Management System.  This reportable information informs OCE members, and the general public, about entities such as the City, who are discharging pollutants into the Receiving Waters used by members at levels that

risk damage to the environment and human health, and the measures such entities are taking to prevent and mitigate pollution.  OCE members rely on this publicly available information for a variety of reasons including to determine whether it is safe to use and enjoy some or all of the Receiving Waters, and to inform and develop advocacy plans or enforcement actions regarding the environmental, human health and safety impacts to some or all of the Receiving Waters caused by the sources of pollution. The City's consistent pattern of failed, delinquent, or inaccurate reporting to FDEP as required by its CWA permits has impaired and will continue to impair OCE's right to public information and has hindered and will continue to hinder OCE members' ability to use the reportable information for the above-mentioned purposes

### iii.    Tampa Bay Waterkeeper

16.    TBWK is a Florida non-profit public benefit corporation with members throughout Tampa Bay. TBWK is dedicated to protecting and improving the Tampa Bay watershed while ensuring swimmable, drinkable, and fishable water for all. TBWK's approach combines sound science, policy advocacy, grassroots community engagement and education to stand up for clean water together as a community, ensuring a clean and vibrant future for the Tampa Bay watershed. To further its mission, TBWK actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. TBWK has been

registered as a non-profit corporation in Florida since 2017. Like SCWK, TBWK is a licensed member of Waterkeeper Alliance, Inc.

17.     TBWK represents its members who have personally suffered harm to their aesthetic, recreational, and employment-related interests due to the City's SSOs and the City's illegal discharges of wastewater into the Receiving Waters. TBWK members use some or all of those waters for boating, fishing, wading, body-contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

18.     TBWK members include members who reside in the vicinity of the Receiving Waters impacted by the City's violations and who have reasonably founded fears that the pollutants contained in the City's SSOs, the excessive nutrient loading to Receiving Waters in violation of the City's NPDES Permit effluent limits, and the City's exceedances of other NPDES Permit limitations have and will continue to contribute to poor water quality in the Receiving Waters that may be dangerous to human health and the environment. TBWK members also include: (1) residents of the communities that border the Manatee River, Tampa Bay and Sarasota Bay who have reasonably founded fears that the excessive nitrogen contained in the City's discharges of raw, partially treated and/or treated reclaimed water cause or exacerbate HABs and the decline in abundance and distribution of seagrasses, both of which negatively impact the Sarasota Bay and Tampa Bay estuaries; (2) commercial and/or charter fishermen who depend upon the ecological health the region's estuaries for their livelihood,

(3) individuals who own and operate businesses in the tourism and marine service industries, whose businesses are adversely impacted by the City's illegal discharges and by public perception of poor water quality in the Receiving Waters; and (4) individuals who devote their time to cleanup, monitoring and/or restoration efforts in and around the Receiving Waters. TBWK members conduct nature surveys and studies, and photograph wildlife in and around some or all of the Receiving Waters. TBWK members contact some or all of the Receiving Waters directly when they perform maintenance work on boats, participate in body-contact water sports, or participate in organized cleanups and habitat seagrass restoration work along the shoreline.

19. TBWK members are interested in access to information which the City is required to report under the CWA. This information is made publicly accessible through the FDEP "Public Notice of Pollution" website and FDEP's Electronic Document Management System. This reportable information informs TBWK members, and the general public, about entities such as the City, who are discharging pollutants into the Receiving Waters used by members at levels that risk damage to the environment and human health, and the measures such entities are taking to prevent and mitigate pollution. TBWK members rely on this publicly available information for a variety of reasons including to determine whether it is safe to use and enjoy some or all of the Receiving Waters, and to inform and develop advocacy plans or enforcement actions regarding the environmental, human health and safety impacts to some or all of the Receiving

Waters caused by the sources of pollution. The City's consistent pattern of failed, delinquent, or inaccurate reporting to FDEP as required by its CWA permits has impaired and will continue to impair TBWK's right to public information and has hindered and will continue to hinder TBWK members' ability to use the reportable information for the above-mentioned purposes.

### iv.   ManaSota-88

20.    ManaSota-88 is a Florida non-profit public benefit corporation with members throughout Southwest Florida. ManaSota-88 has spent over 50 years fighting to protect Florida's environment. It is dedicated to protecting the public's health and preservation of the environment. ManaSota-88 is committed to safeguarding Floridians' air, land, and water quality. ManaSota-88 has members that work, live, and recreate in the Tampa Bay and Sarasota Bay areas in proximity to Bradenton. These members also make use of the waterways and natural areas in proximity to Bradenton for recreational, aesthetic, and related purposes. These members' aesthetic, recreational, and other constitutionally-protected interests are injured by Defendant's actions and omissions as set out herein.

21.    ManaSota-88 represents members who have personally suffered harm to their aesthetic, recreational, and employment-related interests due to the City's illegal discharges of wastewater effluent into the Receiving Waters in violation of the City's NPDES Permit limits and the City's SSOs into the Receiving Waters. ManaSota-88 members enjoy some or all of those waters for

12

boating, fishing, wading, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

22.     ManaSota-88 members include residents in the vicinity of the Receiving Waters affected by the City's violations and who have reasonably founded fears that the pollutants contained in the City's SSOs, the excessive nutrient loading to the Receiving Waters in violation of the City's NPDES Permit effluent limits, and the City's exceedances of other NPDES Permit limitations have and will continue to contribute to poor water quality in the Receiving Waters that may be dangerous to them and human health and the environment.

23.     ManaSota-88 members are interested in access to information which the City is required to report under the CWA. This information is made publicly accessible through the FDEP "Public Notice of Pollution" website and FDEP's Electronic Document Management System.  The reportable information informs SCWK members, and the general public, about entities such as the City, who are discharging pollutants into the Receiving Waters used by members at levels that risk damage to the environment and human health, and the measures such entities are taking to prevent and mitigate pollution.  ManaSota-88 members rely on this publicly available information for a variety of reasons including to determine whether it is safe to use and enjoy some or all of the Receiving Waters, and to inform and develop advocacy plans or enforcement actions regarding the environmental, human health and safety impacts to some or all of the Receiving

Waters caused by the sources of pollution. The City's consistent pattern of failed, delinquent, or inaccurate reporting to FDEP as required by its CWA permits has impaired and will continue to impair ManaSota-88's right to public information and has hindered and will continue to hinder ManaSota-88 members' ability to use the reportable information for the above-mentioned purposes

24.     The City's illegal discharges of pollutants degrade water quality and harm aquatic life in the Receiving Waters, and thus threaten or impair each of the uses described above or contribute to such threats and impairments, ultimately impairing Plaintiffs' members' use and enjoyment of these waters.

25.     The City's illegal discharges of pollutants threaten or impair each of the uses described above or contribute to such threats and impairments. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by the City's failure to comply with its NPDES and MS4 Permits and the Clean Water Act. The relief sought herein will redress the harms to Plaintiffs' members caused by the City's illegal conduct. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate remedy at law.

26.     Plaintiffs bring this action on behalf of their members to address and remedy the injuries in fact suffered by these members as a result of the City's illegal discharges described above. The interests of Plaintiffs' members at stake are germane to the purposes for which SCWK, OCE, TBWK, and ManaSota-88 have

been created. Plaintiffs' organizational purposes all include protecting surface waters from pollution and degradation to promote their members' and the public's abilities to use surface waters for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation.

### B. Defendant

27.     The City is a municipality incorporated under the laws of the state of Florida and a "person" within the meaning of Section 403.031(5), Fla. Stat., and Section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

### i.     The City's Sewage Collection and Treatment System

28.     The City is subject to NPDES Permit No. FL0021369, issued by FDEP for the Bradenton Wastewater Treatment Facility ("WWTF" or "Bradenton WWTF").

29.     The City owns and operates the Bradenton WWTF, and appurtenant sewage wastewater collection and transmission system ("WCTS") which collectively constitute a publicly owned treatment works ("POTW") as defined in Section 212(2) of the CWA, 33 U.S.C. § 1292(2), and 40 C.F.R. Section 125.58(u). The POTW collects and treats sanitary sewage from the City's residents and businesses.

30.     All wastewater collected within Bradenton is transported to the WWTF through the WCTS. The WWTF is located at 1810 1st Street West, Bradenton, FL 34208-3504 in Manatee County.  The WWTF is a 9.0 million

gallons per day ("MGD") annual average daily flow ("AADF") Type I activated sludge advanced wastewater treatment facility. The treated wastewater effluent from the WWTF is either (1) distributed to the City's Reuse System for land application or (2) discharged to the Manatee River.

31.    The point of discharge of wastewater effluent from the Bradenton WWTF is Outfall D-001, which is described in the City's NPDES Permit as follows: "An existing 6.0 MGD AADF discharge to Robinson's Ditch thence the Manatee River below Braden River, a Class III Marine water, (WBID# 1848A). The outfall is a 36-inch diameter ductile iron pipe that discharges effluent through the existing Robinson's ditch storm sewer before discharging to the Manatee River. The point of discharge is located approximately at latitude 27°29' 54" N, longitude 82°33' 17" W."

32.    The City owns and operates the WCTS which consists of approximately 205 linear miles of gravity sewer lines, approximately 37 miles of force mains, 64 wastewater lift stations and approximately 4,500 manholes. The City is also responsible for the lower portion of lateral lines from the City's mainline connection to the property line. Additionally, there are 30 private lift stations providing wastewater flow to the WCTS.

33.    The City is responsible for operating and maintaining the POTW, tasks which include, but are not limited to: properly collecting and conveying sewage through the WCTS, proper treatment at the WWTF, conducting routine maintenance, cleaning, and inspection of the WCTS and WWTF, and responding

to citizens' complaints regarding dischargers of raw and/or partially treated sewage.

### ii.   The City's Municipal Separate Storm Sewer System

34.    The City is the owner and operator of the portions of the MS4 within its political boundaries under MS4 Permit No. FLS000037.

35.    The City's MS4 contains numerous storm drain inlets that lead to underground storm drain pipes, which discharge into the Receiving Waters. The portion of the MS4 within the City's political boundaries serves the areas also served by the WCTS.

36.    The City is responsible for operating and maintaining the MS4 within its political boundaries, tasks which include, but are not limited to, preventing the discharge of non-stormwater (i.e., any substances other than stormwater including but not limited to sewage or re-use water) into the MS4.

### C. The Local Waterways that Receive the City's Illegal Discharges and the Environmental Impacts from those Discharges

37.    The WWTF and WCTS are located in watersheds that drain to the Receiving Waters. The storm pipes in the MS4 owned and operated by the City also discharge into these waters.

38.    SSOs from the WWTF and WCTS, as well as SSOs that enter the MS4 from the WWTF and WCTS  are discharged to the Receiving Waters.

39.    Effluent discharged from Outfall D-001 flows directly into the Manatee River.

40.     The Receiving Waters are waters of the United States, and/or possess a significant nexus to waters that are or were navigable in fact or that could reasonably be so made, and thus are navigable waters as defined by the Clean Water Act and controlling authority.

41.     The Manatee River flows into Tampa Bay, the largest open-water estuary in Florida, encompassing nearly 400 square miles, including numerous smaller bays and waterways and bordering three counties—Hillsborough, Manatee and Pinellas. Tampa Bay's watershed covers a land area of 2,200 square miles. Tampa Bay is an ecologically sensitive water body and a defining feature of Southwest Florida. Tampa Bay is an important and heavily used resource, with special aesthetic and recreational significance for people living in the surrounding communities. The Tampa Bay shoreline has numerous highly valued beaches and points of public access that offer unique recreation opportunities for swimmers, kayakers, paddleboarders, windsurfers, sport fishers, and other recreational users.

42.     Included amongst the Tampa Bay Estuary's prized resources are the Manatee River, Wares Creek, Terra Ceia Aquatic Preserve and Lower Tampa Bay, all listed on the State of Florida's CWA Section 303(d) list of impaired water bodies. A water body that is listed as impaired cannot support its designated beneficial uses. The beneficial uses of these water bodies are: recreation, fish consumption, shellfish propagation, and propagation and maintenance of a healthy, well-balanced population of fish and wildlife.

18

43.     The Terra Ceia Aquatic Preserve receives waters from the Manatee River directly via the Snead Island Cutoff as well as from the mouth of the River at Emerson Point.  The Terra Ceia Aquatic Preserve is an Outstanding Florida Water per Rule 62-30.700(9)(i)(29), FAC. Terra Ceia Aquatic Preserve has open water, several inlet bays, and tidally influenced creeks and rivers and contains a diverse variety of natural communities, including seagrass, mangroves, salt marsh, tidal flats, hardbottom, oyster bars and clam beds. By virtue of its location along southeast Tampa Bay, Terra Ceia represents much of the remaining undeveloped shoreline of one of Florida's most densely populated watersheds. The aquatic preserve contains a considerable amount of Tampa Bay's seagrass and much of the bay's hardbottom acreage. As a temperate/subtropical climatic transition zone, the area provides a natural workshop for the study of effects of climate change and urbanization that is yielding science-derived information of gulf-wide significance.

44.     The Manatee River also flows into the Sarasota Bay Estuarine System ("Sarasota Bay Estuary") which is also an Outstanding Florida Water and worthy of special water quality protections because of its natural attributes. The Sarasota Bay Estuary is a complex and ecologically sensitive coastal lagoon system, with unique embayments, tidal tributaries, small creeks, coves, inlets, and passes that are collectively a defining feature of Southwest Florida and the region's most important natural asset.  The Sarasota Bay Estuary is an important and heavily relied upon resource, with special aesthetic and recreational

significance for people living in the surrounding communities.  The Sarasota Bay
Estuary includes numerous highly valued beaches and points of public access
offer unique recreational opportunities for swimmers, kayakers, windsurfers, sport
fishers, and other recreational users.

45.    The Sarasota Bay Estuary is included, along with 40 other "Special
Waters" in an additional category of protected waters designated by State of
Florida Environmental Regulation Commission as a "Special Water" after
making a finding that the environmental, social, and economic benefits of the
designation outweigh the environmental, social, and economic costs. Rule 62-
302.700(5), F.A.C.

46.    Tampa Bay and Sarasota Bay have significant nitrogen pollution
problems. Between 1950 and 1988, an estimated 42% of the seagrass acreage in
Tampa Bay was lost primarily through excess nitrogen loading and related
increases in phytoplankton concentrations, causing light limitation for seagrass
survival and growth. Since the late 1980s, Tampa Bay has seen significant
recovery of seagrass population through substantial financial investments.
Seagrasses are an essential part of the estuarine ecosystem as they provide food
and habitat for aquatic animals, filter water, reduce erosion, and anchor sediment.
Additionally, juvenile survival rates are much higher for fish and other marine life
in areas where seagrasses have been maintained and restored.  However, the
Manatee River, where the City of Bradenton discharges its treated and partially
treated sewage, has suffered a concerning 21% decline in its seagrass population

20

since 2018, equating to 149 acres.  Nitrogen loading into estuarine waters causes seagrass decline because it causes increases in chlorophyll-a which contributes to poor water clarity and a resulting decrease in seagrass due to decreased sunlight. Water bodies that are impaired for chlorophyll-a indicate excessive nitrogen pollution.

47.     The City's NPDES Permit requires it to limit the amount of Total Nitrogen ("TN") in its effluent.  High TN loading in violation of the City's NPDES Permit, bypasses and SSOs all are significant contributors to poor water quality and fetters the collaborative efforts of stakeholders throughout the region towards seagrass recovery and protection.

48.     The City's persistent NPDES Permit exceedances for TN, repeated bypasses of millions of gallons of partially treated sewage, and its SSOs of raw and partially treated sewage and reclaimed water have all been contributors to increased HABs in the Tampa and Sarasota Bay Estuaries.  The harmful toxins produced as a result of HABs give rise to severe human health consequences, economic and social impacts, as well as harm to the environment, as evidenced by the large quantity of marine wildlife that is killed during "Red Tide" events – wildlife such as fish, manatees, and dolphins.  The loss of seagrass further exacerbates this issue, depriving the ecosystem of needed habitat, food and the nutrient cycling role that is a key to the health of the estuaries.  Seagrass is the primary food source for manatees, and the loss of seagrasses and recent Red Tides

have contributed to the increased mortality and incidences of rescue in the Tampa Bay and Sarasota Bay Estuaries.

49.     HABs occur when too many nutrients exist within a marine environment, causing the rapid growth of algae, such as cyanobacterial "blue-green algae blooms" and *Karenia brevis* ("*K. brevis")* blooms, or "Red Tides." As the algae blooms, it depletes the oxygen in the marine environment, threatening other marine species. The algae can also release harmful toxins that cause illness in humans and animals. According to the Centers for Disease Control and Prevention, cyanotoxin exposure can cause conjunctivitis, rhinitis, earache, sore throat, and swollen lips. Respiratory effects can include atypical pneumonia and a hay fever-like syndrome. Exposure can also cause electrolyte imbalances, headache, malaise, and muscle weakness/pain in joints and limbs. Similarly, red tide produces a neurotoxin called brevetoxin, which can cause respiratory irritation, coughing, and more serious illness for people with severe or chronic respiratory conditions such as emphysema or asthma. It can also cause neurotoxic shellfish poisoning if consumed from oysters and clams.  Brevetoxin has been linked to human neurodegenerative disease and research is currently underway to explore the human neurodegenerative impacts of *K. brevis* exposure.  Several members of the Plaintiff organizations are currently participating in a study by the Roskamp Institute examining blood levels of Brevetoxin in individuals who may have been exposed to Red Tide and may have related central nervous system symptoms or signs.

22

50.     Red Tide also harms South Florida's coastal and marine ecosystems. Studies suggest that nutrients including phosphorus and nitrogen from sewer and wastewater discharges as well as biomass killed by cyanobacteria can energize or reawaken red tide. Red tide is caused by the dinoflagellate *K. brevis* which produces brevetoxins which kill fish, make filter-feeding fish extremely toxic to other animals, and cause respiratory and intestinal distress in humans. Red tide has also been linked to land mammal and bird mortality, and can bioaccumulate. Exposed fish and seagrasses can accumulate high concentrations of brevetoxins and act as toxin vectors to dolphins and manatees, and other marine wildlife, including Endangered Species Act-listed species like sea turtles.

51.     In 2017-2019, a major red tide event occurred in Southwest Florida. The 5-county region of Sarasota Bay and Tampa Bay experienced devastating effects including the killing of thousands of tons of fish, turtles, dolphins, manatees and other marine life, and resulting in a major social and economic downturn for an economy significantly fueled by tourism dollars. Beginning in the early summer of 2021, red tide returned to cause devastation throughout the Tampa Bay and Sarasota Bay Estuaries, with over 800 tons of dead fish washing up throughout the bays and area beaches and setting back the work of resource managers in reducing nutrient pollution in the region's estuaries.  In Tampa Bay, the 2021 red tide was worse than the 2017-2019 event and the macroalgal blooms in upper Sarasota Bay in 2021 were the worst observed in over 35 years.

52.     Besides the direct water and airborne pathways of toxic exposure to humans and wildlife, impacts secondary to fishkills can include skin and respiratory irritation in sensitive members of the human population. The fish kills associated with HABs can cause eyesores and noxious odor conditions associated with dead and decaying fish, making waters unfit for recreational use, aesthetic enjoyment, or spiritual contemplation.

53.     Members of the Plaintiff organizations have suffered injuries in fact caused by the City's illegal discharges and NPDES Permit violations because the City's illegal discharges of raw and partially treated sewage and treated effluent to Receiving Waters have reached and directly contaminated waters that Plaintiffs' members use for body-contact water sports, fishing, boating, and other activities, causing Plaintiffs' members to lessen the frequency and enjoyment of their activities in and around some or all of the Receiving Waters.

54.     The City's SSOs and bypasses cause raw and partially treated sewage to flow into and harm the Receiving Waters, and pose a serious risk to fisheries, wildlife habitat, and human health.  SSOs contain human waste, viruses, protozoa, mold spores and bacteria that are known pathogens that cause disease in humans and wildlife.  SSOs also contain chemicals that cause cancer or reproductive toxicity in humans and wildlife.  These chemicals come from solvents, detergents, cleansers, inks, pesticides, paints, pharmaceuticals, and other chemicals used by households and businesses and then discarded to the sewage collection systems.

55.     By illegally discharging SSOs into the Receiving Waters and the MS4, and by persistently exceeding its NPDES Permit effluent limits for discharges into the Receiving Waters, the City contributes to the continuing impairment and degradation of these waters. As such, the City's violations of the Clean Water Act directly harm Plaintiffs' members' use and enjoyment of the above mentioned waters by: (1) loading these waters with nutrients that have likely exacerbated HABs, fish kills, and conditions noxious to these members' use and enjoyment of these waters and/or that have led these members to have well-founded fears of the worsening of HABs in these waters, (2) loading these waters with bacteriological, viral, and parasitic pathogens and thus leading these members to have well-founded fears that engaging in water contact recreation in these waters has risked or would risk making them or their family members ill, (3) loading these waters with various toxic chemicals leading these members to have well-founded fears that they would be harmed if they engaged in water contact recreation or fishing in these waters, and (4) loading these waters with various toxic chemicals leading these members to have well-founded fears that wildlife they enjoy viewing is at risk of harm due to contamination of these waters.

## IV.     STATUTORY AND LEGAL REQUIREMENTS

### A. The Clean Water Act

56.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of a pollutant by any person to waters of the United States,

except, *inter alia,* in compliance with a NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

57.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, *inter alia,* sewage, sewage sludge, biological material and industrial, municipal and agricultural waste.

58.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

59.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well [or] discrete fissure."

60.     Section 402 of the CWA, 33 U.S.C. § 1342, provides that the permit-issuing authority may issue an NPDES permit that authorizes the discharge of any pollutant to waters of the United States, upon the condition that such discharge will meet all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

61.     The State of Florida has been authorized by EPA to issue NPDES permits.

62.     Pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, and Chapter 403, Florida Statutes (F.S.) and applicable rules of the Florida Administrative Code (F.A.C.), FDEP issued NPDES Permit No. FL0021369 to

the City.  Bradenton's current NPDES Permit FL0021369-014-DW1P/NR was renewed September 9, 2020 and is effective through September 8, 2025.  The City's previous NPDES Permit applicable to the violations alleged in this Complaint is NPDES Permit FL0021369-013-DW1P/NR, effective from July 18, 2017 until the permit was renewed on September 9, 2020.

63.     The City is required to comply with its NPDES Permit with respect to discharges from the POTW or its collection system, and the manner in which it operates and maintains the POTW.

64.     Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), requires an NPDES permit for municipal stormwater discharges. The stormwater element of the federal NPDES Program is mandated by Section 402(p), 33 U.S.C. § 1342(p), and implemented through federal regulations, including 40 C.F.R. Section 122.26. EPA has approved FDEP to administer the stormwater NPDES permit program in Florida. FDEP is authorized under Section 403.0885 of the Florida Statutes (F.S.) and Rule 62- 624 of the Florida Administrative Code (F.A.C.) to implement the stormwater NPDES Program.

65.     Pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, and Chapter 403, Florida Statutes (F.S.) and applicable rules of the Florida Administrative Code (F.A.C.), FDEP issued MS4 Permit No. FLS000037-004 for the City with an issuance date of January 1, 2017 and expiration date of January 11, 2022. The previous MS4 Permit (MS4 Permit No. FLS000037-003) was issued effective December 1, 2011 with an expiration date of November 30, 2016.

66.     The MS4 Permits are NPDES Permits issued by FDEP pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342.

67.     Any violation of the NPDES Permit or the MS4 Permits is a violation of the Clean Water Act. *See* 40 C.F.R. § 122.41(a).

68.     Any unauthorized discharge of a pollutant is a violation of the Clean Water Act under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

69.     Section 505(a) of the Clean Water Act provides for citizen enforcement actions against any "person," for violations of (1) any effluent standard or limitation or (2) an order issued by the Administrator or a State with respect to such a standard or limitation. *See* 33 U.S.C. §§ 1365(a), 1365(f), 1362(5).

70.     Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), authorizes an action for injunctive relief. Each separate violation of the Clean Water Act subjects the violator to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least November 4, 2016 to the present. Civil penalties for violations of the Clean Water Act subject the violator to a penalty of up to $56,460 per day per violation. 40 C.F.R. § 19.4 (effective Dec. 23, 2020).[1] Section

---

[1] The amount of the civil penalty is likely to increase subsequent to the filing of the Complaint because the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Section 701(b)) requires agencies to make annual adjustments for inflation to civil monetary penalties. 5 U.S.C. 553. Pub. L. 114-74 (2015). EPA's most recent annual adjustment was published at 85 FR 83818 (Dec. 23, 2020).

505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits the prevailing or substantially prevailing parties to recover litigation costs, including attorneys' and experts' fees.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Illegal Bypasses in Violation of NPDES Permit**

71.    The City is subject to NPDES Permit No. FL0021369, issued by FDEP for the Bradenton WWTF.

72.    Section IX.22 of the NPDES Permit prohibits "Bypass." Bypass is defined as "the intentional diversion of waste streams from any portion of a treatment works."  NPDES Permit Section IX.22.a.

73.    The City has reported numerous Bypasses of effluent from its full wastewater treatment process, causing at least 160 million gallons of partially treated sewage to enter surface waters since July 31, 2017. Each Bypass is identified in Exhibit 1 attached to this Complaint.   The City's Bypasses are documented in FDEP "Public Notices of Pollution" containing information submitted by the City, the City's reports of SSOs and unauthorized discharge events to FDEP, the City's report to Florida's State Watch Office, the City's correspondence with FDEP regarding the City's WWTF and WCTS, and FDEP documents relating to the City's WWTF and WCTS.

74.    Partially treated wastewater that is Bypassed away from full treatment at the WWTF is discharged through Outfall D-001,

29

75.     Outfall D-001 is a "point source" within the meaning of Section 502(14) of the Clean Water Act. 33 U.S.C. § 1362(14). The City's Bypasses are discharged to the Receiving Waters, which are waters of the United States, in violation of the City's NPDES permit, on at least 13 separate occasions since July 31, 2017. A list of these discharges known to Plaintiffs to-date through public records is listed on Exhibit 1 attached to this Complaint.

76.     The City has Bypassed and continues to illegally Bypass the wastestream from portions of the WWTF and discharged that wastestream into waters of the United States in violation of its NPDES Permit, which is a violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

77.     The Bypasses from the WWTF and WCTS have reached and directly contaminated waters that Plaintiffs' members use for body-contact water sports, fishing, boating, and other activities, causing Plaintiffs' members to lessen the frequency and enjoyment of their activities in and around some or all of the Receiving Waters.

78.     The City's illegal Bypasses have sent partially treated sewage streaming into the Receiving Waters, posing serious public health threats and creating a severe nuisance in exposing substantial numbers of people to sewage that has not been fully treated.

79.     The City's Bypasses of partially treated sewage also cause serious harm to sensitive freshwater and marine environments in area waters, as the

excessive nutrient loading and pathogens and toxic pollutants in sewage adversely affect freshwater and marine life.

80.    Upon information and belief, more Bypasses than those reported by the City may be discovered through this enforcement action. Each such additional Bypass of effluent to waters of the United States will constitute a separate Clean Water Act violation.

81.    The City's Bypasses of effluent to waters of the United States are ongoing and continuing.

82.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least November 4, 2016 to the present.

83.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

84.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing acts and omissions alleged above have and will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

## SECOND CAUSE OF ACTION
### Violations of the City's NPDES Permit Effluent Limitations

85.     The City is subject to NPDES Permit No. FL0021369, issued by FDEP for the Bradenton WWTF.

86.     The NPDES Permit authorizes the City to discharge effluent from the outfall identified as Outfall D-001 in accordance with effluent limitations, monitoring requirements, and other provisions as set forth in the Permit.

87.     Outfall D-001 is a "point source" within the meaning of Section 502(14) of the Clean Water Act. 33 U.S.C. § 1362(14).

88.     Since at least March 1, 2017, the City has continuously discharged effluent from Outfall D-001 into surface waters that contain Total Nitrogen ("TN"), Dichlorobromomethane ("DCBM"), Total Suspended Solids ("TSS"), and Total Residual Chlorine ("TRC") in exceedance of applicable effluent limits in the NPDES Permit. Exhibit 2 identifies such exceedances.

89.     The City's NPDES Permit violations alleged herein are reported in the City's Discharge Monitoring Reports ("DMR") required to be certified by the City under the NPDES Permit and related correspondence between the City and FDEP, documents relating to the City's NPDES Permit and applications for renewal, and in consent orders and amendments between the City and FDEP.

90.     The City has exceeded the effluent limit in its NPDES Permit for TN (5 Year Average) continuously since May 2018, or 43 consecutive months prior to the filing of this Complaint, as set forth on Exhibit 2.

91.    The City has exceeded the effluent limit in its NPDES Permit for TN (Daily Maximum) for 20 months since April 2017 prior to the filing of this Complaint, as set forth on Exhibit 2.

92.    The City has exceeded the effluent limit in its NPDES Permit for TN (Weekly Average) for 16 months since October 2017 prior to the filing of this Complaint, as set forth on Exhibit 2.

93.    The City has exceeded the effluent limit in its NPDES Permit for TN (Monthly Average) for 2 months since August 2021 prior to the filing of this Complaint, as set forth on Exhibit 2.

94.    The City has exceeded the effluent limit in its NPDES Permit for DCBM (Annual Average) for at least 3 months since April 2021 prior to the filing of this Complaint, as set forth on Exhibit 2.

95.    The City has exceeded the effluent limit in its NPDES Permit for TSS (Daily Maximum—Prior to Disinfection at EFB-01) for 9 months since May 2017 prior to the filing of this Complaint, as set forth on Exhibit 2.

96.    The City has exceeded the effluent limit in its NPDES Permit for TSS (Daily Maximum—Effluent Gross at EFD-01) for 8 months since April 2018 prior to the filing of this Complaint, as set forth on Exhibit 2.

97.    The City has exceeded the effluent limit in its NPDES Permit for TRC (Daily Maximum) for 12 months since March 2017 prior to the filing of this Complaint, as set forth on Exhibit 2.

98.     During the period relevant to this Complaint, the City has discharged and likely will continue to discharge effluent from Outfall D-001 containing pollutants in excess of effluent limitations and detection limitations in the NPDES Permit into the Receiving Waters, which are waters of the United States.

99.     TN, DCBM, TSS, and TRC are pollutants within the meaning of Section 502(6) of the Clean Water Act. 33 U.S.C. § 1362(6).

100.    The City's unlawful discharges of pollutants into navigable waters of the United States from a point source it controls, as alleged above, have persisted with full knowledge of the City and with no adequate measures taken to prevent or cease these discharges.

101.    Upon information and belief, more violations of the NPDES Permit may be discovered through this enforcement action. Each such additional NPDES Permit violation will constitute a separate violation of the NPDES Permit and the Clean Water Act.

102.    Each exceedance of an effluent limitation constitutes a separate violation of Section 301 of the CWA, 33 U.S.C. § 1311, for discharging effluent that does not meet the conditions or limitations of the applicable NPDES Permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.

103.    The City's violations of its NPDES Permit effluent limitations, in violation of the Clean Water Act, are ongoing and continuing.

104.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least November 4, 2016 to the present.

105.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

106.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing acts and omissions alleged above have and will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

**THIRD CAUSE OF ACTION**
**Unpermitted Discharges Without NPDES Permit**
**Coverage in Violation of Section 301(a) of the Clean**
**Water Act**

107.    The City has reported numerous unpermitted overflows and discharges of raw and/or partially treated sewage from its WWTF and WCTS, including but not limited to sewer lines, manholes, pump stations, and various other POTW equipment/conveyances that are part of the overall collection system, and reclaimed water from WWTP or its Reuse System since November 4, 2016.  These overflows and discharges are referred to as sanitary sewer overflows ("SSOs"). The City's SSOs are documented in FDEP "Public Notices of Pollution" containing information submitted by the City, the City's reports of SSOs and unauthorized discharge events to FDEP, the City's report to Florida's

State Watch Office, the City's correspondence with FDEP regarding the City's WWTF and WCTS, and FDEP documents relating to the City's WWTF and WCTS.

108.    The City's SSOs are caused by a variety of delayed and inadequate system maintenance, operation, repair, replacement, and rehabilitation practices. These poor practices have led to the overwhelming of system capacity within the WCTS and WWTF due to excessive infiltration and inflow ("I/I") of stormwater and groundwater during wet weather; unaddressed defects in sewer lines such as extensive line cracking, sags in lines, and misaligned joints; blocked gravity lines; overflows at lift stations caused by contractor error, mechanical and equipment failures, power outages, and/or heavy rainfall; overflows at manholes caused by heavy rainfall and/or faulty valves; broken and/or leaking force mains; and leaking pipes at the WWTF.

109.    The City has reported that many of the SSOs from the WCTS are the result of broken sewer lines, pump station equipment and force-main failures; contractor error; heavy rain causing overflows; power failures; bypass valve failures; and blocked gravity lines.

110.    Of the SSOs from the WWTF and WCTS since January 4, 2017, most have discharged to surface waters and/or into the MS4 operated by the City.

111.    The City has discharged SSOs from its WWTF and WCTS to waters of the United States, and/or into its MS4 that then discharges to waters of the United States, in violation of its NPDES permit, on at least 24 separate occasions

36

since January 4, 2017. A list of these discharges known to Plaintiffs to-date through public records is listed on Exhibit 3 attached to this Complaint.

112.    The City has discharged and continues to discharge SSOs from the WWTF and WCTS to waters of the United States, and/or into its MS4 that then discharges to waters of the United States, in violation of its MS4 permit, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

113.    SSOs from the WWTF and WCTS, as well as SSOs that enter the City's MS4 from the WWTF and WCTS, are discharged to the Receiving Waters, and/or to the MS4 that then discharges to the waters of the United States.

114.    SSOs from the WWTF and WCTS have reached and have directly contaminated waters that Plaintiffs' members use for body-contact water sports, fishing, boating, and other activities, causing Plaintiffs' members to lessen the frequency and enjoyment of their activities in and around some or all of the Receiving Waters.

115.    The WWTF and WCTS consist of pipes and other manmade conveyances and constitute a point source under Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

116.    Each of the City's SSOs described in Exhibit 3 that has caused pollutants to flow into waters of the United States constitute a separate violation of Section 301(a) of the Clean Water Act.

117.    Upon information and belief, more discharges of sewage than those reported by the City may be discovered through this enforcement action. Each

such additional SSO discharge to waters of the United States will constitute a separate Clean Water Act violation.

118.   The City's discharges of SSOs to waters of the United States, and/or that enter its MS4 that then discharge to waters of the United States, are ongoing and continuing.

119.   By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least January 4, 2017 to the present.

120.   An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

121.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing acts and omissions alleged above have and will irreparably harm Plaintiffs and the public for which harm they have no other plain, speedy, or adequate remedy at law.

### FOURTH CAUSE OF ACTION
**Sewage Discharges to the City's MS4,**
**in Violation of the MS4 Permits and Clean Water Act**

122.   The City is subject to the following MS4 Permits: MS4 Permit No. FLS000037-003 from December 1, 2011 until November 30, 2016 and MS4 Permit No. FLS000037-004 from January 12, 2017 until January 11, 2022.

123. Part I.A of the MS4 Permits establishes that the City owns and operates the MS4 within its political boundaries of the City of Bradenton. As owner and operator of the MS4, the City is responsible for violations of the Clean Water Act alleged herein related to discharges of sewage into or from the MS4.

124. An MS4 is defined as "a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man- made channels, or storm drains)" owned or operated by a state, city, or town that is designed or used for collecting or conveying storm water and that discharges to waters of the United States. *See* 40 C.F.R. §§ 122.26(b)(8)(i)–(iv); *see also* 40 C.F.R. § 122.26(b)(18).

125. The City's MS4 contains numerous storm drain inlets that lead to underground storm drain pipes, which discharge into the Receiving Waters. The portion of the MS4 within the City's political boundaries serves the areas also served by the WCTS. The portion of the MS4 owned and operated by the City is a point source under Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

126. The MS4 Permits authorize the City to discharge stormwater to waters of the State in accordance with the approved Stormwater Management Program, effluent limitations, monitoring requirements, and other provisions as set forth in the permit.

127.    The MS4 Permits define "Stormwater" as "stormwater runoff, surface runoff and drainage." MS4 Permit No. Number FLS000037-003 at Part X.I and MS4 Permit No. FLS000037-004 at Part X.I.

128.    Part I.D of the MS4 Permits requires the City to prohibit and prevent the introduction of non-stormwater into the MS4 system. Raw or partially treated sewage from SSOs is not within the definition of stormwater. MS4 Permit Nos. FLS000037-003 at Part X.I and FLS000037-004 at Part X.I.

129.    Additionally, Part II.A.7.d. of the MS4 Permits require that the City implement procedures to prevent, contain, and respond to spills that may discharge into the MS4.

130.    The MS4 Permits further requires that the City "take all reasonable steps to minimize or prevent any discharge, reuse of reclaimed water, or residuals use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment." MS4 Permit Nos. FLS000037-003 at Part IX.E and FLS000037-004 at Part IX.5.

131.    The City has discharged and continues to discharge SSOs from the WWTF and WCTS into its MS4 that then discharges to waters of the United States without NPDES permit coverage, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) and Part I.D of the MS4 Permits. The City's SSOs that discharge to its MS4 represents the City's failure to prevent the comingling of stormwater and sewage in violation of Parts I.D. and II.A.7d of the

MS4 Permits, and Part IX.E of MS4 Permit No. FLS000037-003, and Part IX.5 of FLS000037-004.

132.    The City has discharged SSOs from its WWTF and WCTS into its MS4 that then discharges to waters of the United States on at least 22 separate occasions since January 4, 2017. A list of these discharges known to Plaintiffs to-date through public records is listed on Exhibit 3 attached to this Complaint.

133.    Each day of discharge by the City of non-stormwater into the MS4 is a violation of the MS4 Permit and constitutes a separate violation of the Clean Water Act.

134.    Upon information and belief, more SSOs of non-stormwater into the MS4 may be discovered through this enforcement action. Each such additional failure will constitute a separate violation of the MS4 Permits and the Clean Water Act.

135.    The City's discharges of non-stormwater into the MS4, in violation of the MS4 Permits and the Clean Water Act, are ongoing and continuing.

136.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least January 4, 2017 to the present.

137.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

138.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing acts and omissions alleged above have and will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Failure to Comply with NPDES Permit Discharge**
**Monitoring Report Requirements**

139.    The City is subject to NPDES Permit No. FL0021369, issued by FDEP for the Bradenton WWTF.

140.   Part I.D.8 of the City's NPDES Permit requires the City to submit DMRs under specific deadlines.

141.   Part I.D.14 of the City's NPDES Permit requires the City to sign the DMRs in accordance with the Requirements of Rule 62-620.305, F.A.C., which requires the City to make the following certification when submitting every DMR:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

This certification is also found at the bottom of DMR forms.[2]

142.   Part A-Discharge Monitoring Report of the NPDES Permit requires the City to check a box if a DMR is being re-submitted because there was information missing from or information that needed correction on a previously submitted DMR.

143.   The City of Bradenton admitted in an April 9, 2020 letter to FDEP that it had improperly calculated nitrogen values in July, September, October, November, and December 2019 and January and February 2020. At the time the City submitted these DMRs, it had certified to FDEP that the DMRs were true and correct at the time of submission.  In the April 9, 2020 letter Bradenton stated that it had re-submitted corrected calculations for these months in March 2020. Therefore, Bradenton's certification and the values reported on the DMRs for Total Nitrogen were inaccurate for the July–December 2019 and January– February 2020 DMRs, in violation of Parts I.D.8 and 1.D.14 of the NPDES Permit and Rule 62-620.305, F.A.C.

144.   The City has failed to timely submit DMRs as required by the schedule set forth in Part I.D.8 of the City's NPDES Permit for at least 88 days since September 2018. See Exhibit 4.

---

[2] The Eleventh Circuit Court of Appeals has held that "accurate self-reporting is critical to the effective enforcement of environmental laws." *Griffin Indus. V. Irvin*, 496 F.3d 1189, 1206-07 (11th Cir. 2007).

145.    Until the City demonstrates consistent timely delivery of certified accurate DMRs under Part I.D.8 of its NPDES Permit, it remains in continuing violation of its Permit and the Clean Water Act.

146.    Each month that the City fails to submit DMRS by the required Permit deadline or submits a DMR that contains incorrect information causes harm to the Plaintiffs, who continually rely on the timely and accurate submission of DMRS under the Clean Water Act. Additional DMR submission violations may likely be discovered through this enforcement action. Each such additional failure will constitute a separate violation of the NPDES Permit and the Clean Water Act.

147.    Each day the City has failed and continues to fail to correct a previously submitted certified DMR which contained inaccurate information constitutes a separate violation of both the NPDES Permit and the CWA for which a civil penalty can be assessed up to $56,460 per day of violation. 40 C.F.R. § 19.4 (effective Dec. 23, 2020).[3]

148.    Each day the City has failed and continues to fail to timely submit DMRs constitute a separate violation of both the NPDES Permit and the CWA for which a civil penalty can be assessed up to $56,460 per day of violation. 40 C.F.R. § 19.4 (effective Dec. 23, 2020).[4]

---

[3] See *supra* note 1.
[4] See *supra* note 1.

44

149.   By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least November 4, 2016 to the present.

150.   An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

151.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above have and will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

<u>**SIXTH CAUSE OF ACTION**</u>
**Failure to Report Noncompliance under Part IX.20 of the City's NPDES Permit within the Required Deadlines**

152.   The City is subject to NPDES Permit No. FL0021369, issued by FDEP for the Bradenton WWTF.

153.  Part IX.20 of the City's NPDES Permit and Rule 62-620-610, F.A.C. requires the City to report noncompliance with its NPDES Permit within 24 hours and 5 days when it "becomes aware" of such events:

> "The permittee shall report to the Department any noncompliance which may endanger health or the environment. Any information shall be provided orally within 24 hours from the time the permittee becomes aware of the circumstances. A written submission shall also be provided within five days of the time the permittee becomes aware of the circumstances. The written submission shall contain a description of the

45

noncompliance and its cause; the period of noncompliance including exact dates and time, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance."

154.   Exhibits 1 and 3 identify Bypass and SSO events for which the public record is void of the City's required reports to FDEP within 24 hours or 5 days of becoming aware of such events, as required under Section IX.20 of its NPDES Permit.  In total, 20 required reports are not in the public record, and the City provided late reports (*i.e.*, after the deadlines required by its NPDES Permit) 10 times.

155.   Until the City demonstrates consistent timely delivery of complete reports required under Section IX.20 of its NPDES Permit, it remains in continuing violation of its Permit and the Clean Water Act.

156.   Upon information and belief, more failures by the City to report its noncompliance may be discovered through this enforcement action. Each such additional failure will constitute a separate violation of the NPDES Permits and the Clean Water Act.

157.   Each day the City has failed and continues to fail to report its noncompliance constitutes a separate violation of both the NPDES Permit and the CWA for which a civil penalty can be assessed up to $56,460 per day of violation. 40 C.F.R. § 19.4 (effective Dec. 23, 2020).[5]

---

[5] See *supra* note 1.

158.   By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least November 4, 2016 to the present.

159.   An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

160.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above have and will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

**SEVENTH CAUSE OF ACTION**
**Failure to Timely Submit Complete Annual Reports and**
**Reapplication Pursuant to Part VI of the City's MS4**
**Permits**

161.   The City is subject to MS4 Permit No. FLS000037-004 from January 12, 2017 until January 11, 2022.

162.   Part VI.A of the MS4 Permit No. FLS000037-004 (Annual Report: Reporting Period and Due Date) requires as follows: "The permittee shall prepare an ANNUAL REPORT to be submitted no later than six months following the period covered by the report.  The ANNUAL REPORT shall cover the 12-month period beginning on January 1 of each year and must be submitted no later than June 30 of each year."

163.    Parts VI.A (Annual Report: Content) and VI.B (Reapplication: Evaluation of SWMP Effectiveness in Year 4 Annual Report) of the MS4 Permit No. FLS000037-004 sets forth the information required to be included in each Annual Report.

164.    The City did not submit its Year 2 Annual Reports by June 30, 2019 and was given an extension by FDEP to August 19, 2019.

165.    The City submitted an incomplete Year 2 Annual Report on September 3, 2019.

166.    The Year 2 Annual Report submitted by the City on September 3, 2019 did not contain all information required under Part VI.B of MS4 Permit No. FLS000037-004.

167.    On September 25, 2019, FDEP sent an email to the City requesting when the information would be submitted, to which the City did not respond.

168.    On October 4, 2019, FDEP sent a Warning Letter to the City, which stated as follows: "During the file review, Department personnel noted the following:  Failure to submit a complete annual report as required per Rule 62-624.600, F.A.C. and your permit."  Specifically, FDEP found the Year 2 Annual Report to be incomplete regarding Parts III.A.3, A.6, A.7.e and A.7.f.

169.    On December 16, 2019, the City provided additional information regarding its Year 2 Annual report, and FDEP determined the City was in compliance as of that date.

170. The City was not in compliance with Parts VI.A and VI.B of its MS4 Permit No. FLS000037-004 between August 19, 2019 and December 16, 2019.

171. The City did not submit a complete Year 3 Annual Report by June 30, 2020.

172. The City submitted a partial Year 3 Annual Report on July 31, 2020, which did not contain all information required under Part VI.B of MS4 Permit No. FLS000037-004.

173. The City completed submission of its Year 3 Annual Report on August 13, 2020.

174. The City was not in compliance with Parts VI.A and B of its MS4 Permit No. FLS000037-004 between June 30, 2020 and August 13, 2020.

175. The City did not submit its Year 4 Annual Report by June 30, 2021.

176. The City submitted a partial Year 4 Annual Report on July 1, 2021 and a purportedly complete Year 4 Annual Report on July 7, 2021.

177. The City's Year 4 Annual Report did not contain all information, specifically failing to provide information required under MS4 Permit No. FLS000037-004 Parts III.A.7.c (regarding training requirements for Inspection and Investigation of Suspected Illicit Discharges and Improper Disposal), V.B.5 (Assessment Program), and VI.C (Reapplication: Evaluation of SWMP Effectiveness), as indicated by FDEP's request for additional information to the City on December 1, 2021.

49

178.   The City has been out of compliance with Parts VI.A and VI.B of its MS4 Permit No. FLS000037-004 since June 30, 2021.  Until the City provides complete information for its Year 4 Annual Report, the City remains in continuing noncompliance with Parts VI.A and VI.B of its MS4 Permit No. FLS000037-004 as of the date of this Complaint.[6]

179.   Part VII.C of the MS4 Permit No. FLS000037-004 requires as follows: "Duty to Re-apply.  1. The permittee shall submit an application to renew this permit at least 180 days before the expiration date of this permit, or in the Year 4 ANNUAL REPORT.   Reapplication must be in accordance with Rule 62-624.420, F.A.C. . . .  3. The late submittal of a renewal application shall be considered timely and sufficient for the purpose of extending the effectiveness of the expiring permit only if it is submitted and made complete prior to the permit expiration date."

180.   Part VI.C of the MS4 Permit No. FLS000037-004 sets forth additional information required to be included in the Reapplication.

181.   The City did not submit its Reapplication by June 30, 2021.

182.   The one-page document submitted by the City as Attachment 3 to its Year 4 Annual Report referencing MS4 Permit Part VII.C (Duty to Reapply)

---

[6] Plaintiffs note that FDEP requested the City provide requested additional information within 30 days of December 1, 2021, and that the City submitted partial information to FDEP within FDEP's deadline (related to Part V.A). However, based on public records available to Plaintiffs, the remainder of FDEP's request for additional information remains unanswered as of the date of this Complaint and no extension appears in publicly available records to have been given to the City by FDEP.

contains a single sentence: "The City of Bradenton (City) requests renewal of MS4 permit number FLS000037-004—Major Facility."  Attachment 3 does not include the information required by Parts VI.C and VII.C of MS4 Permit No. FLS000037-004.

183.    The City's Year 4 Annual Report did not contain information pertaining to Reapplication consistent with Rule 62-624.420(2), F.A.C., as required by Part VII.C.1 of MS4 Permit No. FLS000037-004.

184.    The City's failure to submit a timely and complete Reapplication by January 11, 2022 will result in the expiration of MS4 Permit No. FLS000037-004 on January 11, 2022 under the terms of Part VII.C.[7]

185.    Until the City demonstrates consistent timely delivery of complete Annual Reports and Reapplications due under its MS4 Permit, it remains in continuing violation of its Permit and the Clean Water Act.

186.    Upon information and belief, more failures to submit Annual Reports and Reapplications required under the City's MS4 Permit may be discovered through this enforcement action. Each such additional failure will constitute a separate violation of the MS4 Permit and the Clean Water Act.

187.   Each day the City has failed and continues to fail to submit Annual Reports and Reapplication constitutes a separate violation of both the MS4

---

[7] Plaintiffs will amend the Complaint after January 11, 2022 to add claims related to an expired MS4 Permit if the factual record indicates such a claim is supported.

Permit and the CWA for which a civil penalty can be assessed up to $56,460 per day of violation. 40 C.F.R. § 19.4 (effective Dec. 23, 2020).[8]

188.   By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least November 4, 2016 to the present.

189.   An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

190.  An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above have and will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

## EIGHTH CAUSE OF ACTION
**Failure to Properly Operate and Maintain the City's POTW Including the Collection System and all related Appurtenances, in Violation of Part IX.7 of the City's NPDES Permit**

191.   The City is subject to NPDES Permit No. FL0021369, issued by FDEP for the Bradenton WWTF.

192.   Part IX.7 of the City's NPDES Permit requires the City to properly operate and maintain the Bradenton WWTF and related appurtenances. Proper operation and maintenance includes, without limitation: properly collecting and

---

[8] See *supra* note 1.

conveying sewage through the WCTS, proper treatment of wastewater at the WWTF, conducting routine maintenance, cleaning, and inspection of the WCTS and WWTF, and responding to citizens' complaints regarding discharges of raw and/or partially treated sewage.

193.   The City has violated Part IX.7 of its NPDES Permits with numerous deficient operation and maintenance practices, resulting in discharges in excess of effluent limitations; overflows of raw sewage from the City's sewer lines, manholes, pump stations, and various other POTW equipment/conveyances that are part of the WCTS and the WWTF; spills and unauthorized discharges of partially treated sewage from the WWTF; and spills and unauthorized discharges of treated reclaimed water.

194.   The City's SSOs have resulted from a variety of poor or inadequate POTW system maintenance, operation, repair, replacement and rehabilitation practices, including under-funding repairs and mismanagement. These poor practices have led to station equipment failures, undersized sewer lines or pump station pumping and/or storage capacity, and the overwhelming of system capacity due to excessive infiltration and inflow of stormwater and groundwater during wet weather. The City has not adequately corrected these operational or maintenance problems, resulting in a deteriorating WWTF and WCTS, and the violations are continuing.

195.   The City's persistent and extensive Clean Water Act violations result from and evince a failure to properly operate and maintain its POTW, including

neglect and mismanagement of its WWTF and all related appurtenances. The City has not taken the actions necessary to comply with the terms of its NPDES and MS4 Permits, which has led to numerous known violations.

196.    The City's unlawful discharges of pollutants into navigable waters of the United States from a point source it controls, in violation of its NPDES Permit, have continued over time, with the knowledge of the City and with no adequate measures taken to prevent or cease these discharges.

197.    The City has failed to act to eliminate its violations of the Clean Water Act. Specifically, the City has failed to adequately operate, maintain, repair, replace, and/or update the WWTF and WCTS, thus resulting in SSOs and NPDES permit violations.

198.    Each day the City fails to properly operate and maintain its POTW is a separate and distinct violation of the Clean Water Act.

199.    The City's failure to properly operate and maintain its POTW is ongoing and continuing.

200.    By committing the acts and omissions alleged above, the City is subject to an assessment of civil penalties pursuant to the Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least November 4, 2016 to the present.

201.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

202.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above have and will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

## VI.    RELIEF REQUESTED

203.    Plaintiffs respectfully request that this Court grant the following relief:

a.    Declare the City to have violated and to be in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for its discharges of SSOs to waters of the United States without an NPDES permit;

b.    Declare the City to have violated and to be in violation of the Clean Water Act for discharging pollutants without complying with the substantive and procedural requirements of the MS4 and NPDES Permits;

c.    Enjoin the City from bypassing effluent to waters of the United States in violation of its NPDES Permit, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

d.    Enjoin the City from discharging SSOs to waters of the United States without an NPDES permit, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a);

e.      Enjoin the City from violating the substantive and

procedural requirements of the Clean Water Act and the MS4 and

NPDES Permits;

f.      Assess civil penalties against the City of up to $56,460 per day

per violation. 40 C.F.R. § 19.4 (effective Dec. 23, 2020).[9]

g.      Award Plaintiffs their reasonable costs of suit, including

attorney, witness, and consultant fees, as provided for under by Sections

309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d) and 1365(a);

and

h.      Any such other relief as the Court deems appropriate.


Dated: January 4, 2022

                                            /s/ Justin Bloom
                                            Justin Bloom (FL Bar 89109)
                                            **JUSTIN BLOOM ATTORNEY AT
                                            LAW, PA**
                                            P.O. Box 1028 Sarasota, FL 34230
                                            Telephone: (941) 275-2922
                                            Facsimile: (866) 574-2169 Email:
                                            bloomesq1@gmail.com

                                            /s/ Michael Goodstein
                                            Michael D. Goodstein (FL Bar
                                            435295)
                                            /s/ Kathryn Schmidt
                                            Kathryn Schmidt (*Motion for Special
                                            Admission under Local Rule 2.01(c)
                                            Forthcoming*)

---

[9] See *supra* note 1.

_/s/ Dana Stotsky_
Dana Stotsky (*Motion for Special Admission under Local Rule 2.01(c) Forthcoming*)
_/s/ Ani Esenyan_
Ani Esenyan (*Motion for Special Admission under Local Rule 2.01(c) Forthcoming*)
**VAN NESS FELDMAN LLP**
1050 Thomas Jefferson St. NW
Seventh Floor
Washington, D.C. 20007
Telephone: 202-298-1800
Facsimile: 202-338-2416
kschmidt@vnf.com
mgoodstein@vnf.com
dstotsky@vnf.com
aesenyan@vnf.com

*Attorneys for Plaintiffs SUNCOAST WATERKEEPER, OUR CHILDREN'S EARTH FOUNDATION, TAMPA BAY WATERKEEPER and MANASOTA-88*