UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNCOAST WATERKEEPER, OUR
CHILDREN'S EARTH
FOUNDATION, TAMPA BAY
WATERKEEPER, and MANASOTA-
88,

        Plaintiffs,

   v.

CITY OF BRADENTON, FLORIDA

        Defendant.

Case No. 8:22-cv-00037-SPF

**CONSENT DECREE**

Table of Contents

I.    JURISDICTION AND VENUE ...................................................................... 2

II.   APPLICABILITY ............................................................................................. 3

III.  OBJECTIVES ................................................................................................... 4

IV.   DEFINITIONS .................................................................................................. 5

V.    COMPLIANCE REQUIREMENTS ................................................................ 8

VI.   REPORTING AND COMMUNICATION BETWEEN THE PARTIES .............. 8

VII.  MS4 ANNUAL REPORTING REQUIREMENTS ........................................ 12

VIII.   PUBLIC ACCESS TO INFORMATION ..................................................... 13

IX.   INCORPORATION AND MODIFICATION ............................................... 15

X.    FORCE MAJEURE .......................................................................................... 15

XI.   DISPUTE RESOLUTION ............................................................................. 20

XII.  PUBLIC INTEREST PROJECT ................................................................... 21

XIII.   COSTS ........................................................................................................... 22

XIV.   STIPULATED PAYMENTS ........................................................................ 24

    a.   Reporting Violations ................................................................................ 24

    b.   Work Commitments under SOW ............................................................ 26

    c.   SSO's and Prohibited Bypasses from the City's WCTS or WWTF ........... 27

    d.   NPDES Permit Effluent Violations ........................................................ 27

XV.  EFFECTIVE DATE ......................................................................................... 32

XVI.   RETENTION OF JURISDICTION ............................................................ 33

XVII.   TERMINATION .......................................................................................... 33

XVIII.   EFFECT OF SETTLEMENT ..................................................................... 38

WHEREAS, on, January 4, 2022, Environmental Groups Suncoast Waterkeeper ("SCWK"), Tampa Bay Waterkeeper ("TBWK"), Our Children's Earth Foundation ("OCE"), and Manasota-88 (collectively "Environmental Groups" or "Plaintiffs") filed this action against defendant City of Bradenton ("the City" or "Defendant") pursuant to the citizen suit provision of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, *et seq.*, alleging raw sewage and wastewater discharges in violation of the CWA;

WHEREAS, the Environmental Groups allege the following violations of the CWA: (1) violations of the *State of Florida Domestic Wastewater Facility Permit* National Pollutant Discharge Elimination System ("NPDES") Permit No. FL0021369 ("NPDES Permit"); (2) discharges of pollutants to waters of the United States without an NPDES Permit authorization in violation of 33 U.S.C. §1311(a); (3) violations of the *State of Florida Municipal Separate Storm Sewer System ("MS4") Permit,* NPDES Permit No. FLS000037 ("MS4 Permit"); and (4) violations of the NPDES and MS4 Permits' reporting requirements;

WHEREAS, the Parties to this Consent Decree have negotiated in good faith and have reached a settlement of the issues raised in the Complaint;

WHEREAS, the City's agreement to this Consent Decree is not an admission of liability to the allegations arising out of the transactions or

1

occurrences alleged in the Complaint, nor is it an admission of the accuracy or veracity of any fact alleged;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree is fair, reasonable, in the public interest, and furthers the objectives of the Clean Water Act.

**NOW, THEREFORE,** with the consent of the Parties, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

## I.   <u>JURISDICTION AND VENUE</u>

1.   This Court has jurisdiction over the subject matter of the claims asserted by the Environmental Groups pursuant to <u>33 U.S.C. § 1365(a)</u>, <u>28 U.S.C. §§ 1331</u>, <u>1355</u>, and <u>1367</u>.   Venue is proper in this judicial district pursuant to <u>33 U.S.C. §§ 1319(b)</u>, <u>1365(c)</u>, and <u>28 U.S.C. § 1391(b)</u> and <u>(c)</u>.   The parties waive any and all objections that they may have to the Court's jurisdiction to enter and enforce this Consent Decree.

## II.  **APPLICABILITY**

2.     The provisions of this Consent Decree apply to and bind the Environmental Groups and the City (collectively, "Parties"), including any successors or assigns. The Parties certify that their undersigned representatives are fully authorized to enter into this Consent Decree, to execute it on behalf of the Parties, and to legally bind the Parties to its terms.

3.     The Parties agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms. By entering into this Consent Decree, the City does not admit liability for any purpose as to any allegation or matter. Nothing in this Consent Decree shall constitute an admission of any fact or a waiver of any right unless specifically set forth herein.

4.     No change in ownership or corporate or other legal status of the City or any transfer of the City's assets or liabilities shall in any way alter the responsibilities of the City or any of its successors or assigns under this Consent Decree. Except to the extent authorized by Section X (Force Majeure), and unless such failure to take action is prohibited or prevented by law, in any action to enforce this Consent Decree, the City shall not raise as a defense the failure by any of its agents, servants, contractors, employees, successors or assigns to take actions necessary to comply with this Consent Decree.

3

5.     Except as otherwise provided in this Paragraph 5, the sale or transfer of ownership or operation of any portion of the WWTF or the WCTS does not relieve the City of its obligations under this Consent Decree. No later than 30 days prior to sale or transfer of ownership or operation of any portion of the WWTF or the WCTS, the City shall give written notice of this Consent Decree to each purchaser or successor in interest. The City also shall give written notification to the Environmental Groups of the anticipated sale or transfer of ownership or operation of the WWTF or the WCTS at least 30 days prior to the scheduled date of such sale or transfer and may seek from the Court a modification of this Consent Decree that would transfer responsibility for compliance with some or all of these provisions to its successor. The Court shall grant such request if the successor is ready, willing, and able to fully implement obligations the successor would assume under the Consent Decree.

## III.   **OBJECTIVES**

6.     The express purpose of the Parties entering into this Consent Decree is for the City to take all necessary measures, consistent with the terms and objectives of the CWA, to achieve full compliance with the CWA, including the terms and conditions of the NPDES Permit and MS4 Permit. All works and obligations set forth in this Consent Decree and its Attachments, and

4

under any modification to this Consent Decree, shall have the objective of ensuring that the City complies with the CWA, including the terms and conditions of the NPDES Permit and the MS4 Permit.

## IV.   DEFINITIONS

"**Bypass**" shall mean the intentional diversion of waste streams from any portion of the WWTF.

"**CMOM**" **or** "**Capacity, Management, Operations, and Maintenance**" shall mean a program of accepted industry practices to properly manage, operate and maintain sanitary wastewater collection, transmission and treatment systems, investigate capacity- constrained areas of these systems, and respond to SSO events.

"**Deliverable**" shall mean any written document required to be prepared and/or submitted by or on behalf of the City pursuant to this Consent Decree or the SOW.

"**FDEP**" shall mean the Florida Department of Environmental Protection.

"**Force Main**" shall mean any pipe that receives and conveys, under pressure, wastewater from the discharge side of a pump. A Force Main is intended to convey wastewater under pressure.

5

**"Gravity Sewer Line" or "Gravity Sewer"** shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but is intended to flow unassisted under the influence of gravity.

**"Infiltration"** shall mean water other than wastewater that enters the WCT (including sewer service connections and foundation drains) from the ground through such means as defective pipes, pipe joints, connections, or manholes.

**"Inflow"** shall mean water other than wastewater that enters the WCT (including sewer service connections) from sources such as, but not limited to, roof leaders, cellar drains, yard drains, area drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm water, surface runoff, street wash waters, or drainage.

**"I/I"** shall mean the total quantity of water from Inflow, Infiltration, and rainfall-induced Inflow and Infiltration without distinguishing the source.

**"Navigable Waters"** shall have the same meaning as found in the Clean Water Act, 33 U.S.C. § 1362(7).

**"Lift Station"** shall mean facilities comprised of pumps which pump wastewater to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that Lift

Station. **"Prohibited Bypass"** shall mean the intentional diversion of waste streams from any portion of the WWTF which diversion is prohibited by the NPDES Permit.

**"Reclaimed Water"** shall have the same meaning as found in Florida Administrative Rule 62-600.200.

**"Sanitary Sewer Overflow or Reclaimed Water Discharge (collectively "SSO")"** shall mean an overflow, spill or release of untreated or partially treated sewage or Reclaimed Water from the City's WCTS or WWTFs that reaches the City's storm-water system or a Navigable Water.

**"SOW"** shall mean the Statement of Work and Compliance Schedule ("SOW") attached hereto as <u>Attachment A</u>.

**"Wastewater Collection and Transmission System ("WCTS")"** shall mean all pipes, Force Mains, Gravity Sewer Lines, Lift Stations, manholes and appurtenances thereto, owned or operated by the City to collect and convey municipal sewage (domestic, commercial and industrial) to the WWTF.

**"Wastewater Treatment Facility ("WWTF")"** shall mean devices or systems used in the storage, treatment, disposal, and reclamation of municipal wastewater and includes all facilities owned, managed, operated, and maintained by the City at the Bradenton WWTF, which is located at 1810 1st

Street West, Bradenton, FL 34208-3504 in Manatee County.  The WWTF is a

9.0 million gallons per day annual average daily flow Type 1 activated sludge

advanced wastewater treatment facility.   The WWTF is subject to NPDES

Permit No. FL0021369.


V.     **COMPLIANCE REQUIREMENTS**

7.     The City agrees to perform all work specified in the SOW., which

is expected to (1) eliminate conditions throughout the City's wastewater

infrastructure causing Prohibited Bypasses at the Bradenton WWTF, (2) to

reduce SSOs at the WWTF and from Bradenton's WCTS, and (3) to bring the

City into compliance with its NPDES Permit effluent limitations. The City

further agrees to take all measures necessary to ensure timely and complete

reporting as required under the CWA, including under the NPDES Permit and

the MS4 Permit.


VI.    **REPORTING   AND   COMMUNICATION   BETWEEN   THE**

       **PARTIES**

8.     Until Termination, the City shall report to the Environmental

Groups as follows:

a. The City shall prepare and deliver to the Environmental Groups semi-annual reports as required in Section IV of the SOW ("**Semi-Annual Reports**") and Deliverables. The Semi-Annual Reports and Deliverables are subject to review, comment and non-binding recommendations from Environmental Groups' engineer. Such recommendations shall be consistent with and shall be predicated on best engineering practices and industry standards in the sanitary sewer industry and shall be provided on or before the date that is 45 days after the date of delivery of the Semi-Annual Report.

b. The City shall provide courtesy copies to Environmental Groups of all material correspondence with FDEP regarding: (i) Consent Order OGC File No. 18-1466; (ii) the MS4 Permit; (iii) SSOs or Prohibited Bypasses; (iv) noncompliance with the NPDES Permit; and (v) permits needed to comply with the SOW. The City shall provide such courtesy copies of correspondence no later than the date that is 3 days after the date on which the relevant correspondence is delivered to FDEP. Reporting under this subparagraph 8.b shall commence

9

within 14 days of the Effective Date, unless otherwise specified in an <u>Attachment h</u>ereto.

9.    If additional documents reasonably related to the NPDES Permit, the MS4 Permit, or the activities required under the SOW or under this Consent Decree are requested in writing by Environmental Groups, the City will reasonably respond with documents in the City's possession.  Nothing herein prevents the City from regularly communicating directly with the Environmental Groups' consultant concerning the work required hereunder.

10.    During the life of this Consent Decree, the City shall preserve non-privileged records and documents, including computer-stored information, in its possession that document the City's performance under this Consent Decree. The City shall not be required to preserve screenshots or otherwise to preserve or archive documentation of the state of the Webpage on past dates.

11.    All documents and notices required to be forwarded by one Party to another shall be sent to the following individuals as electronic computer files at the e-mail addresses specified below, or to a mailing address if a given document cannot be e-mailed. Any change in the individuals designated by either Party must be made in writing to the other Parties.

Environmental Groups:

Kevin Draganchuk, P.E., BCEE
President and Principal Engineer, CEA Engineers, P.C.
Board Certified Environmental Engineer – Water Supply and
Wastewater Specialty
KDraganchuk@ceaengineerspc.com
Phone: 845-372-9674
25 Dogwood Drive,
Bloomingburg, NY 12721


Defendant City of Bradenton:

Rob Perry
City Manager
City of Bradenton, Florida
101 12th St. W., Bradenton, FL 34205
Rob.Perry@BradentonFL.gov

With copies to:

Scott Rudacille, Esq.
City Attorney, City of Bradenton, FL
Blalock Walters
802 11th St. W., Bradenton, FL 34205
srudacille@blalockwalters.com

Jim McLellan, P.E.
Director
Public Works & Utilities Department
City of Bradenton, Florida
101 12th St. W., Bradenton, FL 34205
Jim.Mclellan@cityofbradenton.com

11

## VII.   MS4 ANNUAL REPORTING REQUIREMENTS

12.    By May 15, 2022, the City shall submit a complete response to FDEP's email dated December 1, 2021 requesting additional information regarding the City's Annual Report for Year 4 and Reapplication for permit renewal as required under Part VI.A of its MS4 Permit.  If the City receives additional Requests for Additional Information ("RAI") from FDEP regarding its Annual Report for Year 4 and Reapplication, the City shall provide complete and timely responses to each such RAI by the deadline requested by FDEP, including any extension given by FDEP.

13.    Unless the MS4 Permit specifies a different date for submission of Annual Reports, by June 30 of every year, the City shall submit to FDEP a complete Annual Report each year as required under the MS4 Permit. Further, the City shall provide a complete response to any subsequent FDEP RAI by the deadline requested by FDEP, including any extension given by FDEP.

14.    Stipulated payments under subparagraph 35.a.iv shall be suspended during such time as the City is responding to an RAI issued by FDEP related to its MS4 Annual Report and shall resume at such time as the City fails to respond to the RAI within the deadline requested by FDEP for a response to the RAI.

12

## VIII. **PUBLIC ACCESS TO INFORMATION**

15.   By June 1, 2022, the City shall establish and maintain a page ("**Webpage**") on its website providing the following information:

   a.   Descriptions of SSOs and Bypasses which (i) occurred during the previous twelve (12) months; (ii) originate from the City's WCTS or WWTF; and (iii) are reportable under Section IX. 20. of the NPDES Permit.

   b.   Links to the FDEP Pollution Notice website; the Florida Department of Health in Manatee County; Tampa Bay Estuary Program and the Sarasota Bay Estuary Program.

16.   The Webpage shall be accessible to the public through a visible link on the City's website homepage. After the Webpage is established, it shall always reflect current information until Termination, as follows:

   a. A copy of all reports submitted under Section IX.20. of the NPDES Permit shall be posted on or before the end of the next business day following the day on which the incident was reported to FDEP or State Watch. To the extent a Pollution Incident Report includes all information reported to State Watch, posting the Pollution Incident Report shall satisfy this requirement.

13

b. For any SSO or Bypass that is ongoing, the City shall highlight any such event on the Webpage by rendering text related to such ongoing event in a larger red font size and near the top of the Webpage and shall identify the specific surface waters affected.

17.    In the event the City commences the use of social media prior to Termination, the City shall inform the public of SSOs and Bypasses through social media on the same day the event is first reported to FDEP or State Watch.

18.    Stipulated payments  under Paragraph 35.a.v shall not begin to accrue until such time as: (i) Environmental Groups have delivered written notice to the City identifying noncompliance with this Section VIII of this Consent Decree; (ii) seven days have passed since delivery of Environmental Groups' written notice identifying noncompliance; and (iii) the noncompliance has not been cured.  Stipulated payments shall not be assessed for periods during which the Webpage is inaccessible due to any remedial measures taken by the City in response to any legal action based on the Americans with Disabilities Act.

19.     For SSOs or Bypasses which are reportable under <u>Fla. Stat. §</u> <u>403.077(1)</u>, the City will submit to FDEP a Public Notice of Pollution within 24 hours of an SSO or Bypass pursuant to <u>Fla. Stat. § 403.077</u>.

## IX.   <u>INCORPORATION AND MODIFICATION</u>

20.     This Consent Decree and its Attachments contain the entire agreement between the Parties, and no material modifications shall be valid unless in writing, mutually agreed to and executed by the Parties, and entered by the Court. Non-material changes to this Consent Decree, including its Attachments, may be made by written agreement of the Parties without Court approval, and such written modifications shall be deemed incorporated into this Consent Decree. The Parties may by mutual agreement determine whether a modification is non-material. Any disputes between the Parties will be resolved under the Dispute Resolution Provisions of Section XI (Dispute Resolution), unless the Parties agree otherwise in writing.

## X.   <u>FORCE MAJEURE</u>

21.     "**Force Majeure**", for purposes of this Consent Decree, is defined as any event arising from or condition created by causes beyond the control of the City, of any entity controlled by the City, or of the City's consultants and

contractors which event or condition delays or prevents the performance of any obligation under this Consent Decree or the SOW despite the City's best efforts to fulfill the obligation. The requirement that the City exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event or condition and best efforts to address the effects of any such event or condition (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent reasonably possible.

22.   Where any compliance obligation under this Consent Decree requires the City to obtain a Federal, State, or local permit or approval, the City should submit timely and complete applications and take all other actions required by law to obtain all such permits or approvals. The City may seek relief under the provisions of this Section X (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation (such delay, a "**Permitting Delay**") to the extent that the City has submitted timely and complete applications and has taken all other actions required by law to obtain all such permits or approvals.

23.   Where any compliance obligation under this Consent Decree requires the City to procure or receive shipments of goods, materials, or

16

equipment the City shall commence and diligently pursue any procurement procedures necessary to fulfill the obligation, including without limitation, requests for proposals, requests for bids, the issuance of purchase orders, receipts or confirmations which document orders for or purchase of goods, equipment, or materials, and the like.  The City may seek relief under the provisions of this Section X (Force Majeure) for any delay in the performance of any such obligation resulting from delayed shipment or delivery of goods, equipment, or materials, or from shipping damage to goods, equipment, or materials (such delay, a "**Procurement Delay**"), to the extent that the City has diligently pursued procurement necessary to comply with its obligations under this Consent Decree.

24.    "Force Majeure" does not include the City's financial inability or failure to provide sufficient staffing or contractor resources to perform any obligation under this Consent Decree.

25.    If any event occurs or has occurred or any condition arises, has arisen, or is likely to arise that may delay or has delayed the performance of any obligation under this Consent Decree, whether or not caused by Force Majeure, the City shall provide notice via email to Environmental Groups within 72 hours of when the City first reasonably believed the event or condition was likely to cause a delay or has caused a delay (such email notice,

17

the "**Initial Notice**"). Within 14 days thereafter, the City shall provide in writing to Environmental Groups an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the City's rationale for attributing such delay to Force Majeure if it intends to assert such a claim; and a statement as to whether, in the opinion of the City, such event may cause or contribute to an endangerment to public health, welfare or the environment ("**Written Explanation**"). The City shall include with its Written Explanation documentation supporting the claim that the delay was attributable to Force Majeure.  Failure to comply with the requirements of this Paragraph 25 shall preclude the City from asserting any claim of Force Majeure predicated on the event or condition for the period of time of such failure to comply. The City shall be deemed to know of any circumstance of which the City, any entity controlled by the City, or the City's contractors knew or should have known.

26.    If Environmental Groups agree that the delay or anticipated delay is attributable to Force Majeure, the time for performance of the obligations under this Consent Decree that are affected by Force Majeure will be extended for such time as is necessary to complete those obligations, provided the City

remains in compliance with Paragraph 21(b). An extension of the time for performance of the obligations affected by Force Majeure shall not, of itself, extend the time for performance of any other obligation.

27.    Environmental Groups shall notify the City in writing of the length of the extension, if any, for performance of the obligations affected by Force Majeure, if any. If Environmental Groups do not agree that the delay or anticipated delay is attributable to Force Majeure, Environmental Groups will notify the City in writing of its decision (such written notice, the "**Objection Notice**") on or before the date that is 14 days after the date of the City's delivery of the Written Explanation. Environmental Groups' failure to provide the Objection Notice within 30 days of receipt of the Written Explanation shall constitute Environmental Groups' agreement that the delay or anticipated delay is attributable to Force Majeure.

28.    If the City elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so on or before the date that is 15 days after the date of receipt of Environmental Groups' Objection Notice. In any such proceeding, the City shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by Force Majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts

19

were exercised to avoid and mitigate the effects of the delay, and that the City complied with the requirements of Paragraph 25 above. If the City carries this burden, the delay at issue shall be deemed not to be a violation by the City of the affected obligation of this Consent Decree.

29.    Stipulated payments pursuant to Section XIV (Stipulated Payments), shall not apply or accrue as a result of periods of delay which are caused by Force Majeure.

## XI.    DISPUTE RESOLUTION

30.    The Dispute Resolution procedure of this Paragraph shall be the exclusive mechanism to resolve any disputes arising under this Consent Decree. Any dispute that arises under this Consent Decree shall initially be subject to a period of informal negotiations, which shall not extend beyond 14 days unless the Parties otherwise mutually agree in writing to an extension of the informal negotiation period. The dispute shall be considered to have arisen on the date one Party receives written notification from the other, specifically referencing this Paragraph, that there is a dispute. If the Parties cannot resolve a dispute by informal negotiations, then either Party may file a Dispute Resolution motion with the Court. The motion shall refer to this Consent Decree and Paragraph and shall set forth the nature of the dispute and a proposal for its resolution.  The City's failure to properly budget or appropriate

funds or to provide sufficient staffing or contractor resources necessary to comply with the terms of the SOW shall not be an excuse for non-compliance. Environmental Groups' engineer's non-binding recommendations shall not become obligations unless following the recommendations is necessary in order for the City to adhere to best practices in the sanitary sewer industry.  As to all other disputes under this Paragraph, the Court shall determine which proposed resolution is most in keeping with the objectives, goals, and requirements of this Consent Decree and the Clean Water Act and consistent with best engineering practices and industry standards for the sanitary sewer industry.

## XII.  PUBLIC INTEREST PROJECT

31.    On or before the date that is 45 days after the Effective Date, the City shall make a payment of $220,000 to Tampa Bay Estuary Program ("**TBEP**") to be used for projects to secure environmental benefits to the watersheds and ocean waters in and adjacent to the City, including Manatee River and Lower Tampa Bay, unless the parties file a Modification under Section IX (Incorporation and Modification) prior to the date that is 45 days after the Effective Date requiring the City's performance of a Public Interest Project in lieu of such payment.  A decision by either party not to enter into such a mutual agreement is within that party's sole, absolute and unreviewable discretion and is not subject to Section XI (Dispute Resolution). Any

21

payment due hereunder to TBEP shall be sent to Tampa Bay Estuary Program (263 13th Avenue South, Suite 350, St. Petersburg, FL 33701).

## XIII. COSTS

32.     The City will pay the Environmental Groups' costs of litigation, excluding attorneys fees, under 33 U.S.C. § 1365(d), as follows:

    a. On or before the date that is 14 days after the Effective Date, the City shall pay Plaintiffs' costs, in accordance with payment instructions to be provided by Plaintiffs within 7 days of the Effective Date:

        i. $31,802 for Environmental Groups' expert fees and other costs incurred through the date the Consent Decree is sent to the United States under Section XV (Effective Date) and

        ii.  $54,000 for the first three years to fund costs of the Environmental Group's engineer to monitor the City's compliance with this Consent Decree.

    b. On or before the date that is the third anniversary date of the Effective Date, the City shall pay $54,000 for the next three years to fund the costs of the Environmental Groups' engineer

to monitor the City's compliance with this Consent Decree. Plaintiffs will provide payment instructions at least 14 days prior to the payment date.

33.     Within 7 days of the date the Environmental Groups agree to terminate the Consent Decree under Section XVII (Termination), the Environmental Groups will refund to the City all unexpended funds from the two payments paid by the City under subparagraph a.ii and b, with an accounting of all expenditures.

34.     Plaintiffs' claim for reasonable attorneys fees under 33 U.S.C. § 1365(d) is not resolved by this Consent Decree.  So as not to delay the Court's entry of the settlement contained in this Consent Decree, Plaintiffs expressly reserve all rights to seek attorneys fees from the Court incurred through the Effective Date and to seek attorneys fees incurred for monitoring and/or enforcing the City's compliance with the Consent Decree after the Effective Date.  The City acknowledges Plaintiffs' reservation of right.  Both Parties agree to exercise good faith efforts to resolve attorneys fees after the date the Consent Decree is sent to the United States under Section XV (Effective Date) and to inform the Court if they resolve this issue. Otherwise, Plaintiffs will promptly file a motion for attorneys fees after the Effective Date.

23

## XIV.  STIPULATED PAYMENTS

35.    <u>Schedule of Amounts</u>: The City shall pay stipulated payments to TBEP for non-compliance with this Consent Decree between the date of the Effective Date and Termination, according to the schedule below. Payment assessment shall end upon the date of Termination.

    a.    <u>Reporting Violations</u>

*i. Discharge Monitoring Reports ("DMRs") required under Part I.D.8 of NPDES Permit*

| Period of Noncompliance | Late, Payment Per Day[1] | Incorrect, Payment Per Day[2] |
|---|---|---|
| Days 1-14 | $150 | $300 |
| Days 15-30 | $750 | $1,000 |
| Days 31 and later | $1,000 | $1,500 |

*ii. 24 Hour Report required under Part IX.20 of NPDES Permit*

| Period of Noncompliance | Late, Payment Per Day | Incomplete, Payment Per Day[3] |
|---|---|---|
| Days 1-2 | $150 | $100 |
| Days 3-4 | $500 | $450 |
| Days 5 and later | $750 | $700 |

---

[1] "Late, Payment Per Day" will be calculated from due date of reports, exclusive of the due date.
[2] "Incorrect, Payment Per Day" will be calculated from date report was submitted, exclusive of the date of submission.
[3] "Incomplete, Payment Per Day" will be calculated from date report was submitted, exclusive of the date of submission.

*iii. 5 Day Report required under Part IX.20 of NPDES Permit*

| Period of Noncompliance | Late, Payment Per Day | Incomplete, Payment Per Day |
|---|---|---|
| Days 1-14 | $150 | $200 |
| Days 15-30 | $750 | $1,000 |
| Days 31 and later | $1,000 | $1,500 |

*iv. MS4 Annual Reports and RAI Responses required under Section VII (MS4 Annual Reporting Requirements)*

| Period of Noncompliance | Late, Payment Per Day | Incomplete, Payment Per Day |
|---|---|---|
| Days 1-14 | $150 | $200 |
| Days 15-30 | $1,000 | $1,500 |
| Days 31 and later | $2,000 | $2,500 |

*v. City's Website Establishment and Maintenance under Section VIII (Public Access to Information)*

| Period of Noncompliance | Payment Per Day[4] |
|---|---|
| Days 1-14 | $150 |
| Days 15-30 | $500 |
| Days 31 and later | $1,000 |

---

[4] "Payment Per Day" will be calculated from due date under Consent Decree, exclusive of the due date.

*vi.    Semi-Annual Reports and Deliverables Due to Environmental Groups under the SOW and Contemporaneous Communications with FDEP under Section VI (Reporting and Communication Between the Parties)*

| Period of Noncompliance | Payment Per Day |
|---|---|
| Days 1-14 | $150 |
| Days 15-30 | $750 |
| Days 31 and later | $1,000 |

In no event shall stipulated payments for the City's failure to provide courtesy copies pursuant to subparagraph 8.b exceed $500 for any single item of correspondence.

b.    <u>Work Commitments under SOW</u>

| Period of Noncompliance | Payment Per Day |
|---|---|
| Days 1-14 | $500 |
| Days 15-30 | $750 |
| Days 31-60 | $1,000 |
| Days 61 and later | $2,000 |

26

c. <u>SSO's and Prohibited Bypasses from the City's WCTS or WWTF</u>

| | Payment Per Day per Discharge depending on time from Effective Date | | |
|---|---|---|---|
| Total Discharge Volume | Within 2 years of Effective Date | Between 2-5 years from Effective Date | More than 5 years from Effective Date |
| Up to 10,000 gallons | $700 | $700 | $700 |
| 10,000 to 100,000 gallons | $1,000 | $5,000 | $6,000 |
| 100,001 gallons to 1 million gallons | $2,500 | $10,000 | $12,000 |
| In excess of 1 million gallons | $4,000 | $12,000 | $15,000 |

d. <u>NPDES Permit Effluent Violations</u>

| Effluent Limit | Permit limit exceeded | Payment | Payment Assessment Start Date |
|---|---|---|---|
| Total Nitrogen | 19.20 tons/year, Five-Year Average | $3,000 per month | August 1, 2023 |
| Total Nitrogen | 6 mg/L, maximum | $3,000 per month | Effective Date |
| Total Nitrogen | 4.5 mg/L, weekly average | $3,000 per month | Effective Date |
| Total Nitrogen | 3.75 mg/L, monthly average | $3,000 per month | Effective Date |

27

| Dichlorobromomethane | 22 Ug/L, annual average effluent limit | $9,000 per quarter | November 1, 2022 |
|---|---|---|---|
| Total Suspended Solids | 5 mg/L, prior to disinfection at EFB-01 | $3,000 per month | Effective Date |
| Total Suspended Solids | 10 mg/L, effluent gross at EFD-01 | $3,000 per month | Effective Date |
| Total Residual Chlorine | 1 mg/L, minimum effluent limit | $3,000 per month | Effective Date |

If the City violates an effluent limit due to a Prohibited Bypass, the stipulated payment under this subparagraph 35.d shall not apply, provided the City pays the stipulated payment due for Prohibited Bypass under subparagraph 35.c.

36.    Any stipulated payment due under subparagraphs c and d shall be reduced (such reduction, the "**Payment Offset**") by any monetary amounts demanded by FDEP for the same violation. In the event the City elects to pursue an in-kind penalty project in lieu of the payment of monetary amounts demanded by FDEP, the Payment Offset shall consist of the monetary amount demanded by FDEP which forms the basis of the in-kind penalty project value.

28

37. <u>Notifications and Timing of Payment</u>

a. <u>SSOs, Prohibited Bypasses, and violations of NPDES Permit effluent limit violations under Paragraph 35, subparagraphs c and d</u>:

(1)    In the event that FDEP provides written demand to the City to pay any stipulated penalties for SSOs, Prohibited Bypasses, or NPDES Permit effluent limit violations, the City shall pay the corresponding stipulated payments to TBEP on or before the date that is 30 days after the date of the FDEP's written demand.

(2)    In the event that FDEP fails to make a written demand for payment of stipulated penalties on or before the date that is 140 days after the date on which the alleged violation occurred or, in the case of SSOs or Prohibited Bypasses, the date of cessation of the SSO or Prohibited Bypass, the Environmental Groups may make a written demand to the City that stipulated payments are due to TBEP, and such stipulated payments shall be payable to TBEP on or before the date that is 30 days after the date of Environmental Groups' demand.   The Environmental

29

Groups' written demand shall state the basis for the alleged violation(s).

(3)    If the City disputes its liability for any stipulated payment(s) demanded by Environmental Groups, it shall provide a written notice of a dispute to Environmental Groups on or before the payment due date, and the matter shall be resolved through Dispute Resolution under Section XI (Dispute Resolution) unless the Parties agree otherwise in writing.

(4)    No stipulated payments shall be due in the event Environmental Groups do not make a written demand for stipulated payments hereunder to the City on or before the date that is 150 days after the date on which an alleged violation occurred or, in the case of SSOs and Prohibited Bypasses, the date of cessation of the SSO or Prohibited Bypass.  Likewise, stipulated payments shall be imposed if the City fails to notify Environmental Groups of a dispute by the due date pursuant to subparagraph (3).

b.     Reporting and Work Commitment violations under
Paragraph 35, subparagraphs a and b: The City shall pay TBEP
on or before the date that is 30 days after receipt of Environmental
Groups' written demand to the City that stipulated payments are
due, which written demand shall state the basis for the alleged
violation(s).  If the City disputes its liability for any stipulated
payment(s) demanded by Environmental Groups, it will provide a
written notice of a dispute to Environmental Groups on or before
the payment due date, and the matter will be resolved through
Dispute Resolution under Section XI  (Dispute Resolution) unless
the Parties agree otherwise in writing.  No stipulated payments
will be due in the event Environmental Groups do not make a
written demand for stipulated payments hereunder to the City on
or before the date that is 60 days after the date of the alleged
violation. Likewise, stipulated payments shall be imposed if the
City fails to notify Environmental Groups of a dispute on or before
the due date herein.

38.    TBEP Payments: Any stipulated payment due to TBEP under this
Section XIV shall only be used for the express purpose of projects identified in
Paragraph 31.  The City shall send such payments to the address identified in

Paragraph 31 and, within 7 days thereafter, provide to Environmental Groups'
representatives identified in Paragraph 11 a copy of records documenting all
stipulated payment(s) to TBEP under this Consent Decree and identifying the
violations for which payment is made.

39.    Upon appropriate showing by the City, the Court may reduce the
stipulated payment due as warranted by due consideration of the criteria set
forth in <u>33 U.S.C. § 1319(d)</u>.

## XV.   <u>EFFECTIVE DATE</u>

40.    This Consent Decree becomes effective on the date signed and
entered by the Court, following the requisite forty-five (45) day review period
by the United States under <u>33 U.S.C. § 1365(c)(3)</u>.   Environmental Groups are
responsible for providing a copy of this Consent Decree to the United States
Environmental Protection Agency and the United States Department of
Justice.

## XVI.  <u>RETENTION OF JURISDICTION</u>

41.    The Court shall retain jurisdiction to enforce the terms of this Consent Decree until Termination and to resolve disputes that are not resolved through the dispute resolution process prescribed above that may arise between the Parties.

## XVII. <u>TERMINATION</u>

42.    <u>Final Termination Notice</u>:  The City shall initiate termination by providing to Environmental Groups a written notice ("**Final Termination Notice**") which documents and certifies to Environmental Groups that it has met all of the following requirements:

> a.  All work required by the Consent Decree and the SOW has been completed. The Final Termination Notice shall include documentation reasonably adequate to establish that the relevant works or obligations have been completed in accordance with the terms of this Consent Decree and the SOW. This condition may be documented in full or in part by the City's provision of Obligation-Specific Completion Notices, as defined below; and

33

b. any payments due under Section XIII (Costs) and XIV (Stipulated Payments) have been paid in full.

43. <u>Obligation-Specific Completion Notices</u>:

a. The City may, at any time following the Effective Date, at the City's sole discretion, deliver a notice to Environmental Groups certifying the completion of any specific work or obligation, or any combination of works or obligations, set forth in the SOW or in this Consent Decree (**"Obligation-Specific Completion Notice"**). Any Obligation-Specific Completion Notice shall be included in a Semi-Annual Report and identify the works or obligations the City contends have been completed and shall include documentation reasonably adequate to establish that the relevant works or obligations have been completed in accordance with the terms of this Consent Decree and the SOW.

b. Following City's delivery of an Obligation-Specific Completion Notice, Environmental Groups may, on or before the date that is 180 days after the date on which the Obligation-Specific Completion Notice was delivered, either:

i. deliver to City a written acknowledgement that the Obligation-Specific Completion Notice is satisfactory, in

34

which case (a) the works or obligations described therein shall be deemed complete, (b) Environmental Groups shall waive any future objection related to such works or obligations, and (c) no stipulated payments related to the works or obligation shall be assessed; or

ii.  deliver to City a written objection specifying the alleged deficiencies in the works or obligations addressed in the Obligation-Specific Completion Notice.

c.  Environmental Groups' failure to respond in writing within the 180-day period described above shall be deemed an acknowledgement under Paragraph 43.i that the Obligation Specific Completion Notice is satisfactory.

44.    All   Obligation-Specific   Completion   Notices   which   the Environmental Groups have acknowledged as satisfactory or have been deemed satisfactory pursuant to Paragraph 43.c above shall be attached to any Final Termination Notice.

45.    <u>Early Termination Notice</u>: The City may initiate early termination if it documents and certifies to Environmental Groups that it has met all of the following requirements:

35

    a. The City has achieved 36 consecutive months of compliance with the CWA, including the MS4 Permit and the NPDES Permit;

    b. any payments due under Section XIII (Costs) and XIV (Stipulated Payments) have been paid in full; and

    c. All work required by the Consent Decree and the SOW which is required by the Consent Decree or the SOW to have been completed as of the time the City delivers the Early Termination Notice has been completed as of the date on which the City delivers the Early Termination Notice, which completion may be documented in full or in part by the City's provision of Obligation-Specific Completion Notices.

Early Termination Notices may only be considered during "dry season" between November 15 and May 15.

    46.    All Final Termination Notice, Early Termination Notice or Obligation-Specific Completion Notices shall be certified by the City's Director of Public Works and state as follows:

> *I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering such*

36

> *information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.*

47. Plaintiffs will respond to a Final Termination Notice on or before the date that is 14 days after the date of receipt of such notice. Plaintiffs shall respond to an Early Termination Notice on or before the date that is 30 days after the date of receipt of such notice. If Environmental Groups agree with the City's Final Termination Notice or Early Termination Notice, then the Parties shall file a joint motion for termination. If Environmental Groups dispute the City's completion of the requirements hereunder, the City may move the Court for termination of the Consent Decree on the basis that it has satisfied the requirements of Final Termination or Early Termination. Such motion must adhere to the Local Rules requiring a meet and confer process prior to the filing of such motion and an opportunity for Environmental Groups to brief the matter to the Court in response to the motion. The Court's review of any such motion will be limited to a determination as to whether the City has satisfied all requirements for Final Termination or Early Termination.

48. The City expects to initiate Final Termination on or before December 31, 2028. In any case, this Consent Decree shall terminate ten (10) years from the Effective Date unless extended by the Court to resolve a then-pending dispute between the parties.

## XVIII.   **EFFECT OF SETTLEMENT**

49.   This Consent Decree is neither a permit nor a modification of existing permits under any federal, state, or local law and in no way relieves the City of its responsibilities to comply with all applicable federal, state and local laws and regulations. Compliance with this Consent Decree, including the payment of all monetary sums due under this Consent Decree and the completion of all obligations required pursuant to this Consent Decree resolves the Environmental Groups' civil claims for the violations through the Effective Date, alleged against the City in the Complaint filed herein. In consideration of the City's agreement to this Consent Decree and Attachments and in reliance on the Court's Retention of Jurisdiction under Section XVI (Retention of Jurisdiction), the Environmental Groups hereby release the City, and its successors and assigns, from any and all alleged CWA violations that have or could have been claimed in the Complaint through the Effective Date.

**IT IS SO ORDERED** this 29ᵗʰ day of _June_, 2022.

_____

Sean P. Flynn
United States Magistrate Judge

38

ATTACHMENTS TO CONSENT DECREE:

A. Statement of Work and Compliance Schedule

B. September 2021 Final I&I Analysis

C. List of Manholes and Gravity Pipes Outside the Public Right of Way

D. List of Unassessed Pipes and Manholes

E. List of WWTF improvements recommended by consultant (De Nora)

F. Spreadsheet Template for TN 5-Year Average Calculations reported on DMRs

G. Completion Status of List of WWTF improvements recommended by consultant (De Nora)

H. Lift Station Prioritization Ranking for Emergency Power Source/Emergency Pumping Capacity Rehabilitation

I. Draft October 2021 CMOM Report

J. Force Main Valve Inspection Schedule

**WE HEREBY CONSENT** to the entry of this Consent Decree:

**<u>FOR ENVIRONMENTAL GROUPS SUNCOAST WATERKEEPER,
OUR CHILDREN'S EARTH FOUNDATION, TAMPA BAY WATER
KEEPER AND MANASOTA-88:</u>**

_____ / 5/5/2022
Rusty Chinnis, Board Chair        (Date)
Suncoast Waterkeeper

_____ / **5/5/2022**
Tiffany Schauer, Executive Director   (Date)
Our Children's Earth Foundation

_____ / 5-5-2022
Megan Eakins, Board Chair         (Date)
Tampa Bay Waterkeeper

_____ / 5/5/2022
Glenn Compton, Chairman          (Date)
Manasota-88

40

## ENVIRONMENTAL GROUPS' COUNSEL:

**Lead Counsel:**
/s/ *Kathryn Schmidt*
Kathryn Schmidt
*Pro hac vice* (Dkt. 13)
/s/ *Michael Goodstein*
Michael D. Goodstein
(FL Bar 435295)
/s/ *Dana Stotsky*
Dana Stotsky
*Pro hac vice* (Dkt. 12)

**VAN NESS FELDMAN LLP**
1050 Thomas Jefferson St. NW
Seventh Floor
Washington, D.C. 20007
Telephone: 202-298-1800
Facsimile: 202-338-2416
kschmidt@vnf.com
mgoodstein@vnf.com
dstotsky@vnf.com

/s/ *Justin Bloom*
Justin Bloom
FL Bar # 89109
Justin Bloom Attorney at Law, PA
P.O. Box 1028
Sarasota, FL 34230
Telephone: (917) 991-7593
Facsimile: (866) 574-2169
Email: bloomesq1@gmail.com

**FOR DEFENDANT CITY OF BRADENTON:**

_____, Mayor of the City of Bradenton, Florida

Reviewed/approved RJP 5/11/22

ATTEST:
Tamara Melton
City Clerk
City of Bradenton, Florida

_____    _____
City Clerk                                            (DATE)

REVIEWED AND APPROVED

_____
Scott E. Rudacille, City Attorney

**DEFENSE COUNSEL:**

/s/ Dominick Graziano
Dominick J. Graziano, Esq.
Florida Bar No.: 831270
**BUSH GRAZIANO RICE & PLATTER, P.A.**
100 S. Ashley Drive, Suite 1400
Tampa, FL 33602
Phone: 813-228-7000
Fax: 813-273-0091
Emails:     dgraziano@bgrplaw.com
                jcochran@bgrplaw.com
                dhensley@bgrplaw.com

42